

JOHN S. POULOS
Nevada Bar No. 15085
E-Mail: John.Poulos@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
2020 W. El Camino Ave., Suite 700
Sacramento, CA 95833
TELE: 916.564.5400
FAX: 916.564.5444

MATTHEW A. CAVANAUGH
Nevada Bar No. 11077
E-Mail: Matthew.Cavanaugh@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 South Rainbow Blvd., Suite 600
Las Vegas, NV 89118
TELE: 702.893.3383
FAX: 702.893.3789

Attorneys for Relator CMB EXPORT,
LLC, a Texas limited liability company

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES ex rel. CMB EXPORT, LLC, a Texas limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> TONOPAH SOLAR ENERGY, LLC, a Nevada limited liability company, COBRA ENERGY INVESTMENT, LLC, a Delaware limited liability company, COBRA ENERGY INVESTMENT FINANCE, INC., a Delaware corporation, COBRA INDUSTRIAL SERVICES, INC., a Delaware corporation, COBRA THERMOSOLAR PLANTS, INC, a Nevada corporation, COBRA INSTALACIONES Y SERVICIOS S.A., a Spanish corporation, ACS SERVICIOS COMUNICACIONES Y ENERGIA, S.L., a Spanish corporation, and DOES 1 through 50, inclusive, <br><br> Defendants. | CASE NO.   2:20-cv-00196 *SEALED* <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** <br><br> **DEMAND FOR JURY TRIAL** |

4838-3775-0707.1

COMPLAINT

## INTRODUCTION

1.     This litigation concerns false claims for tax grants made in connection with the construction and operation of a solar thermal power plant project located in Tonopah, Nye County, Nevada. The project is owned by Tonopah Solar Energy, LLC, a Delaware limited liability company ("TSE"), and is referred to herein as the Crescent Dunes Project or, simply, the Project.

2.     The Crescent Dunes Project was constructed by Defendant Cobra Thermosolar Plants, Inc., a Nevada corporation ("CTPI"), and at the times relevant to the matters alleged herein was owned and operated by affiliates of CTPI and SolarReserve, Inc. ("SolarReserve"). CTPI's obligations with respect to the construction of the Project are set forth in that certain Contract for the Engineering, Procurement and Construction of the 110 MW Nominal Capacity Thermosolar Electrical Generation Facility In Tonopah, Nevada, USA by and between Tonopah Solar Energy, LLC and CTPI, dated September 20, 2011 (the "EPC Contract")

3.     To fund construction and operation of the Crescent Dunes Project, SolarReserve, through its indirect subsidiary SolarReserve CSP Finance, LLC, and Defendant Cobra Energy Investment Finance, LLC ("Cobra Finance"), an affiliate of CTPI and an indirect subsidiary of ACS Servicios Comunicaciones y Energia, S.L., obtained loans from CMB Infrastructure Investment Group IX, L.P. ("Group IX") and CMB Infrastructure Investment Group XI, L.P. ("Group XI"), respectively, in the aggregate total amount of approximately $170 million.  At all times relevant to the matters alleged herein, Relator CMB Export, LLC ("Relator" or "CMB Export") was general partner of Group IX and Group XI. Each of those loans was evidenced by a loan agreement setting forth the various obligations SolarReserve CSP Finance, LLC, owed to Group IX ("the Group IX Loan Agreement") and Cobra Finance owed to Group XI ("the Group XI Loan Agreement"). This was in addition to a loan in the approximate original principal amount of $715 million that TSE obtained from the Federal Financing Bank ("FFB") through the United States

Department of Energy ("DoE") loan guaranty program, and pursuant to which FFB funded, and DoE guaranteed, that loan.

4. Repayment of the indebtedness described in Paragraph 3 was expected to have been funded through revenues generated from a power purchase agreement ("PPA") entered into between TSE and Nevada Power Company d/b/a NV Energy ("NVE"), cash grants expected to be received from the U.S. Department of Treasury under Section 1603 of the American Recovery and Reinvestment Tax Act ("1603 Cash Grants"), and certain tax monetization events. However, due to numerous errors and gross negligence in CTPI's engineering and construction of the Crescent Dunes Project (which continue to plague the Project to this date), CTPI's operation of the Project prior to turning the Project over to TSE, and various acts, omissions and willful misconduct of CTPI and its parents and affiliates, the Crescent Dunes Project has failed to meet its electrical power generation requirements under the PPA, has been offline for significant periods of time, and currently is not operational. These circumstances have resulted in the Project's insolvency, and, in turn, to various defaults under the loan extended by Group IX and under the terms of the PPA with NVE.

5. Indisputably, CTPI was responsible for constructing and delivering a grossly defective non-functioning power plant, yet the Cobra Defendants have engaged in a complex course of conduct designed to shift blame to SolarReserve and to shield themselves from responsibility. In so doing, Relator is informed and believes and on that basis alleges that the Defendants manipulated the Project development, construction and operations processes to secure the 1603 Cash Grants, based on knowingly false information about the Project's operational status, while withholding information from the Project's lenders about CTPI's qualifications, poor workmanship and operational failures.

6. Relator is informed and believes, and thereon alleges, that in order to avoid losing ownership in and control of the Project, affiliates of Cobra Finance and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-3775-0707.1

3

COMPLAINT

CTPI attempted to foist onto TSE, as the Project owner, and indirectly on to SolarReserve, a poorly constructed, fundamentally deficient solar power plant with over 2,000 warranty claims arising from inadequate, incomplete or defective labor, services, materials and equipment furnished by CTPI or other Cobra affiliates. That power plant was, as a result of CTPI and its affiliates' gross negligence and willful misconduct, doomed to failure.

7.    Relator is informed and believes, and thereon alleges, that as part of their fraudulent and calculated scheme, CTPI, Cobra Finance, and their affiliates, manipulated circumstances surrounding the Project so that Provisional Acceptance—which consisted of an extensive series of specifically defined benchmarks and checkpoints the Project had to meet before operation of the Project would pass to TSE—was granted and subsequently misrepresented the true state of affairs at the Project so that they could avoid assessment of liquidated damages (and other ramifications) against CTPI under the EPC Contract for CTPI's grossly negligent performance, force the responsibility for the Project's operation and inevitable failure onto SolarReserve, and obtain the benefit of the 1603 Cash Grants and other tax incentives from the U.S. government, as well as the ability to claim depreciation.

8.    Relator is further informed and believes and on that basis alleges that Cobra Finance, in concert with CTPI and their affiliates, also sought to hide the multitude of defects dooming the Project from CMB Export, in violation of Cobra Finance's covenants and obligations under the Group XI Loan Agreement it entered into with Group XI. Those intentional nondisclosures and misrepresentations caused CMB Export to forego enforcement and mitigation efforts it could have taken on behalf of Group IX and Group XI at a time when those efforts would have resulted in satisfaction of at least a substantial portion of the indebtedness owed to Group IX by SolarReserve CSP Finance, LLC, under the Group IX Loan Agreement.

9.    Because of the wrongful, grossly negligent, and fraudulent acts of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

CTPI, Cobra Finance, and their parent and affiliates that had guaranteed performance of CTPI and Cobra Finance with respect to the Project, the Project is an utter failure, preventing SolarReserve from repaying Group IX the full balance of the $90 million loaned to it by Group IX under the Group IX Loan Agreement.

## THE PARTIES AND RELATED ENTITIES

10. Relator CMB Export is a limited liability company organized and existing under the laws of the state of Texas. Until 2016, CMB Export was organized and existing under the laws of the state of California. CMB Export is, and at all times relevant to the matters alleged herein, was the general partner of both Group IX and Group XI. Reference to CMB Export shall hereinafter refer to it in its capacity as general partner of Group IX and/or Group XI, and as relator in the herein alleged claim under the False Claims Act.

11. Group IX is a limited partnership organized and existing under the laws of the state of California.

12. Group XI is a limited partnership organized and existing under the laws of the state of California.

13. SolarReserve, Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principle place of business in California. SolarReserve is the parent company of SolarReserve, LLC, which is the sole member of SolarReserve CSP Finance, LLC, which is the sole member of SolarReserve CSP Holdings, LLC, which owns 50% of the membership interests in (including the right to appoint 50% of the directors of ) Tonopah Solar Investment, LLC ("TSI"). TSI, in turn, controlled TSE through two subsidiary holding companies.

14. Relator is informed and believes, and thereon alleges, that Defendant TSE is a Delaware limited liability company with its principal place of business in Nevada.

15. Relator is informed and believes, and thereon alleges, that Defendant

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Cobra Energy Investment, LLC ("CEI"), is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Las Vegas, Nevada. At the times relevant to the matters alleged herein, CEI was a 50% member of TSI.

16.   Relator is informed and believes, and thereon alleges, that Defendant Cobra Finance is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Houston, Texas.

17.   Relator is informed and believes, and thereon alleges, that Defendant Cobra Industrial Services, Inc. ("CIS") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Houston, Texas. Relator is informed and believes, and thereon alleges, that CIS owns and controls both Cobra Finance and CEI.

18.   Relator is informed and believes, and thereon alleges, that Defendant CTPI is a corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Houston, Texas.

19.   Relator is informed and believes, and thereon alleges, that Defendant Cobra Instalaciones y Servicios S.A. ("Cobra Instalaciones") is a Sociedad Anonima organized and existing under the laws of Spain, with its principal place of business in Spain, and is an indirect parent company of CTPI, Cobra Finance, and CEI.

20.   Relator is informed and believes, and thereon alleges, that Defendant ACS Servicios Comunicaciones Y Energia, S.L., ("ACS") is a Sociedad De Responsabilidad Limitada organized and existing under the laws of Spain, with its principal place of business in Spain and is the direct parent company of Cobra Instalaciones. Collectively, Cobra Finance, CEI, CIS, CTPI, Cobra Instalaciones, and ACS shall hereinafter be referred to as "the Cobra Defendants".

21.   Defendants Does 1-50, inclusive, are sued in this Complaint under fictitious names. Their true names and capacities are unknown to Relator. When their true names and capacities are discovered, Relator will amend this Complaint

by inserting their true names and capacities herein. Relator is informed and believes, and thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint, and that the damages Relator asserts herein were proximately caused by those Defendants. Relator lacks further information at this time concerning the true identity of these fictitiously named defendants, but will amend this complaint when such further information is discovered.

22.    Relator is informed and believes, and thereon alleges that, at all material times herein Defendants, and each of them, are joint and contributing tortfeasors who either acted in concert to accomplish a common purpose, agreement or plan, and were the agents, servants, principals, employees, co-conspirators or alter egos of one or more of the other Defendants, and acted with the other Defendants' knowledge, consent, and approval and within the course and scope of that agency, employment or conspiracy. As such, each of the Defendants is responsible for the liabilities of the other Defendants, as alleged herein.

## VENUE AND JURISDICTION

23.    Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, as this complaint asserts claims under the Federal False Claims Act.

24.    Venue in this court is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732, as certain of the Defendants are located in this district and as a substantial portion of the matters alleged herein occurred in this district.

## FACTS

25.    Group IX and Group XI are entities formed for investment opportunities under the EB-5 Immigrant Investor Program under the Immigration Act of 1990, which allows foreign investors to make certain minimum investments into business ventures in the United States on the condition that each such investment creates at least ten jobs in the United States over a certain period of time. The foreign investors apply for conditional permanent residence in this country, and,

4838-3775-0707.1

7

COMPLAINT

if all conditions are met, including sustaining the investment at risk for the required period of time, apply to remove conditions on their residency status. CMB Export is general partner of both Group IX and Group XI.

26. SolarReserve is a U.S.-based developer of utility-scale solar power projects. It developed the concept and technology underlying the Crescent Dunes Project, which uses concentrated solar power and molten salt technology to generate electricity.

27. The Crescent Dunes Project (and the technology it utilizes) was designed so that numerous mirrors concentrate sunlight at a solar tower, which collects and transmits the massive amount of heat generated by the concentrated sunlight to molten salt stored in a tank below the solar tower. As designed, the molten salt functions as a heat storage receptacle so that the solar power plant can remain operational and generate electricity even in the absence of sunlight. Under the Project's concept and design, the molten salt, which retains heat longer than other substances, such as water, is stored in a hot salt tank, and the heat emitted from the molten salt is used to create steam to power turbines that generate electricity. To function properly, the Project requires highly complex mechanisms to position thousands of mirrors in precisely the right way so as to focus maximum sunlight at the tower and collect optimal amounts of heat.

28. The only portion of the Project that SolarReserve constructed was the receiver, which functioned as intended. The balance of the Project was designed and constructed by Cobra.

The Project's Genesis

29. SolarReserve, LLC ("SR LLC"), a direct and wholly owned subsidiary of SolarReserve, caused the Certificate of Formation of TSE to be filed with the Delaware Secretary of State on or about February 25, 2008. The stated purpose of TSE as set forth in its initial Limited Liability Company Agreement dated March 3, 2008, executed by SR LLC as TSE's then-sole member, included "to acquire,

4838-3775-0707.1

8

COMPLAINT

develop, permit, finance, construct, own, and operate a solar thermal project" and to engage in any and all other activities necessary or incidental thereto.

30. Given the complexity of the Project's concept and design, its construction required significant funding. To meet those funding requirements, SolarReserve sought debt financing under a U.S. government loan program whereby the FFB made loans guaranteed by the DoE in support of certain types of renewable energy projects. Through the DoE loan guaranty program, FFB agreed to fund the majority of the Project's construction, but, inter alia, required SolarReserve to (a) obtain additional funding to cover remaining development costs; (b) bring into the Project a construction contractor with expertise in the construction of electrical power plants; and (c) procure a purchaser of the electricity to be generated by the Project.

31. To satisfy the DoE's prerequisites, SolarReserve entered into contractual relationships with NVE, certain Cobra subsidiaries and affiliates, and CMB Export, respectively. The discussions and negotiations leading to the various contractual relationships began in approximately 2009, and culminated with the execution of various agreements in the autumn of 2011.

The SolarReserve-Cobra Relationship

32. The relationship between SolarReserve and the Cobra entities is memorialized in various agreements, including the limited liability company operating agreements of various special purpose entities relating to the direct and indirect ownership and management of the business affairs of TSE—the direct owner of the Crescent Dunes Project—as well as agreements regarding the construction, maintenance and operation of the Tonopah Solar Energy 110 MW Concentrating Solar Power Plant comprising the Crescent Dunes Project.

33. The foundational concept of the various contractual arrangements between SolarReserve and the Cobra Defendants was that the two parties would, through their indirect subsidiaries, function largely as 50/50 equity members in TSI,

4838-3775-0707.1

9

COMPLAINT

the indirect parent of TSE, with each of SolarReserve and Cobra having the right to appoint an equal number of designees who together would constitute TSI's board of directors. That board of directors would indirectly control essentially all material management decisions of each of the indirect and direct parent companies of TSE, and would also have veto rights with respect to essentially all material decisions of the TSE board of directors.

34. In connection therewith, CTPI executed the EPC Contract for the Project and therefore controlled and was directly responsible, as EPC Contractor, for the engineering, procurement and construction of the Project. Under the EPC Contract, until Provisional Acceptance, as defined therein, was achieved, CTPI was responsible for operation and maintenance and the Project. Thereafter, SolarReserve would be responsible for operation of the Project under a Management Services Agreement ("the MSA"). Thus, from approximately 2010 until December of 2016, CTPI had complete and sole control over the Project except as to non-construction and warranty-related matters, which were made by TSI. Subsequent to December of 2016, the parties agreed to transfer the operation of the Project to TSE as requested by DoE before the deadline to satisfy all conditions for receiving the 1603 Cash Grants was set to expire, but before the Project was capable of being used for its intended purpose. In fact, to date, the Project has never been capable of being used for its intended purpose. It was not until the Project was transferred to TSE that TSI had any say in TSE's operation of the Project, and then only to the extent of major decisions.

35. The relationship between SolarReserve and the Cobra entities with respect to their participation in the management and control of the Project is memorialized in the operating agreement for TSI. Per that operating agreement, SolarReserve CSP Holdings, LLC, and CEI, each hold a 50% membership interest in TSI, with management rights fully vested in the two members. At the times relevant to the matters alleged herein, SolarReserve CSP Holdings, LLC, was a

4838-3775-0707.1

COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

wholly-owned subsidiary of SolarReserve CSP Finance, LLC ("SR CSP"), which was a wholly-owned subsidiary of SR LLC, which was a wholly-owned subsidiary of SolarReserve. Relator is informed and believes, and thereon alleges, that CEI is a subsidiary of ACS.

36.    Through their joint ownership of TSI, SolarReserve and Cobra jointly controlled TSE through multiple holding companies. Specifically, at the times relevant to the matters alleged herein, Tonopah Solar Energy Holdings I, LLC ("TSEH I"), generally managed Tonopah Solar Energy Holdings II, LLC ("TSEH II"), with both holding companies governed by their respective LLC agreements. Pursuant to those agreements, the TSEH I board of directors was to be composed of up to 6 directors and, if required by DOE Loan Guaranty Agreement, one additional "Independent Director". TSI appointed four directors, two of which were designated by SolarReserve and two of which were designated by Cobra. In or about May of 2018, upon DoE's insistence, the board of managers was reconstituted with two independent managers (appointed by the DoE), a SolarReserve appointee, and a Cobra appointee. Thus, SR CSP and CEI each held a 50% membership interest in TSI, which in turn controlled TSEH I, which controlled TSEH II, which controlled TSE, the operating entity of the Crescent Dunes Project.

37.    Although various subsidiaries of each entity were involved, the decision-making authority for the construction and operation resided with CTPI, as the EPC contractor, until the Project was turned over to TSE in December of 2016. Thereafter, TSE utilized SolarReserve to operate the Project pursuant to the MSA. Kevin Smith was the CEO of SolarReserve at the time the Project was turned over to TSE. At the times relevant to the matters alleged herein, Cristobal Gonzalez was Cobra's appointee to the board of managers of TSE.

The Construction and Operating Contracts

38.    On or about November 4, 2009, TSE and NVE entered into the PPA, which provides for the Crescent Dunes Project to produce electrical power for the

4838-3775-0707.1

11

COMPLAINT

Nevada power grid over a 25-year term. Because the technology underlying the project was the first of its kind, NVE negotiated certain construction checkpoints that were designed to ensure that the project would be operational and generating power per the terms of the PPA. Specifically, the PPA required the Crescent Dunes Project to be operational within four years after the PPA received necessary regulatory approval to commence construction of the Crescent Dunes Project. It also required the plant to achieve certain electrical generation levels and demonstrate that it could generate power at those levels on a continuous basis. The tests and project milestones were formulated to ensure satisfactory progress and timely completion in the construction of the Project.

39.    In or about September of 2011, TSE entered into the EPC Contract with CTPI, pursuant to which CTPI agreed to engineer, procure equipment for, construct, and commission the Crescent Dunes Project.

40.    Under the EPC Contract, CTPI was obligated to, among other things, design the plant, develop technical documentation, carry out engineering services, and promptly correct any deficiencies in its work and bear the cost of any necessary repair work in connection with the same, and perform its work in a manner to successfully comply with the specifications and performance metrics and within the timeframes set forth in the PPA. The EPC Contract provided for liquidated damages if the Project was not constructed on time, and CTPI warranted that the construction was to be completed properly. If there were any issues with the construction of the Project, CTPI is contractually obligated to remedy the issue.

41.    The EPC Contract imposed certain timeframes CTPI was required to meet. Specifically, CTPI was required to attain Provisional Acceptance—which was to be measured by a series of detailed conditions and performance tests specified in the EPC—no later than 30 months after it received notice from TSE to commence work on the project. Ultimately, the Provisional Acceptance deadline was extended to March of 2015 after CTPI demonstrated its inability to meet the original deadline.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-3775-0707.1

12

COMPLAINT

42. Upon Provisional Acceptance, which, in addition to satisfying various performance tests, required CTPI to have completed its work under the EPC Contract, including any item that may impair the safe, reliable, normal and continuous operation of the plant in accordance with the EPC Contract's requirements, applicable laws and prudent industry practices, operation of the plant would be delivered to TSE. Until that date, the Project remained under the exclusive operation of CTPI. CTPI was required to achieve Guaranteed Final Acceptance—that is, completion of all work under the EPC Contract—within one year of Provisional Acceptance.

43. CTPI was also required under the EPC Contract to deliver to TSE and SolarReserve monthly written status reports, and to attend and participate in monthly meetings with TSE for the purpose of discussing the status of its work on the project and anticipating and resolving problems.

44. CTPI's performance under the EPC Contract was unconditionally guaranteed by ACS. Relator is informed and believes, and thereon alleges, that ACS is the parent of and controls both CTPI and Cobra Finance.

45. Around the same time as CTPI and TSE entered into the EPC Contract, TSE and SR LLC entered into the MSA, pursuant to which SR LLC agreed to manage the Crescent Dunes Project for an initial term of ten (10) years, subject to an indefinite number of five (5) year extensions. Relator is informed and believes, and thereon alleges, that DoE required SR LLC to manage the Project as SolarReserve did not have the conflicts of interest that the Cobra entities had: the Cobra entities were equity members and CTPI was the EPC Contractor, whereas SolarReserve entities were only equity members. Relator is further informed and believes, and thereon alleges, that DoE was initially concerned about the Cobra Defendants acting in concert and therefore believed that SR LLC was the only true independent party involved in the Project.

The Lending Structure

4838-3775-0707.1

13

COMPLAINT

46.   In or about the autumn of 2011, TSE obtained funding necessary to proceed with the development of the Crescent Dunes Project. The funding totaled in excess of $700 million, and was memorialized by a Loan Guaranty Agreement ("LGA") it entered into with the DoE. The LGA imposed certain requirements on SolarReserve, CEI, and TSE in order to induce the DoE to issue the guaranty necessary for the procurement of the funding.

47.   In obtaining the DoE guaranty, both SolarReserve and CEI were required to make certain financial covenants, including making base equity contributions and providing letters of credit to supplement funding of the Crescent Dunes Project, as well as making certain indemnity payments to TSE in order for TSE to pay various costs and expenses associated with the Crescent Dunes Project.

48.   In connection with its and its subsidiaries' obligations under the LGA, MSA, and related documents, SolarReserve sought funding from CMB Export.  In or about November of 2012, and as a result of extensive negotiations, Group IX extended a loan to SR CSP, a wholly-owned subsidiary of SR LLC, in the maximum principal amount of $90 million ("the Group IX Loan"). SR CSP's obligations with respect to the Group IX Loan were set forth in the Group IX Loan Agreement. To induce Group IX to extend the Group IX Loan, SolarReserve guaranteed the indebtedness. SR CSP also pledged as collateral any tax monetization proceeds and the available cash flow from the Project, which available cash flow included any cash grants received by TSE from the U.S. government. The maturity date under the relevant loan documents was February 15, 2019, six years from the date of the first disbursement.

49.   In connection with its and its affiliates' obligations under the LGA, EPC Contract, and related documents, representatives for CIS, CEI, and Cobra Finance also sought funding from CMB Export. In or about June of 2013, after extensive negotiations, Group XI extended a loan to Cobra Finance in the maximum principal amount of $80 million ("the Group XI Loan"). The loan is memorialized in

14

COMPLAINT

the Group XI Loan Agreement, dated June 11, 2013. Cobra Finance's obligations thereunder were guaranteed by Cobra Instalaciones.

50.    During the negotiations of the Group XI loan, the Cobra Defendants represented to CMB Export that CTPI would have letters of credit in place supporting the Crescent Dunes Project that would cover any financial shortfalls, including performance of the Crescent Dunes Project below levels expected or required under the LGA and PPA, thereby providing further assurance to Group IX and Group XI that the project would have sufficient liquidity to repay the indebtedness per the terms of the loan agreements. The Cobra Defendants' representations confirmed representations made by SR CSP during its negotiation of the Group IX loan.

51.    As part of their covenants to Group IX and Group XI under the relevant loan agreements, SR CSP and Cobra Finance, respectively, promised to make certain disclosures regarding the status and performance of the Crescent Dunes Project. Among other things, both SR CSP and Cobra Finance were required to provide operating statements, EB-5 documentation, annual financial statements, construction progress reports, disclosures regarding events of default or any development that would have a material adverse effect on the Project, as well as litigation, arbitration, or government investigation or threats thereof, and other information, including previously prepared reports, contracts, schedules, lists, documents, agreements and instruments concerning the Crescent Dunes Project.

### Construction and Operation of the Project

52.    TSE's performance under the PPA with NVE was central to the vitality of the Crescent Dunes Project. It was the primary source of revenue expected from the Project, as well as the 1603 Cash Grants, and the primary contemplated method through which the Group IX and Group XI loans would be repaid, in addition to amounts to be received from any cash grants as well as any tax monetization events. Relator is informed and believes, and thereon alleges, that Defendants knew at all

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-3775-0707.1

15

COMPLAINT

times that their failure to perform under the EPC Contract and the PPA would effectively render the Project a disaster, as failure to properly construct the plant would result in a breach of the PPA, which would in turn give NVE cause to terminate the PPA and eliminate the only contemplated revenue source of the Project, while also preventing the Project from qualifying for the 1603 Cash Grants.

53.    Group IX, Group XI, and CMB Export relied upon the representations of SR CSP and the Cobra Defendants that there would be letters of credit in place. In the event the Project did not perform as required under the PPA, resulting in no revenues from the Project from which to pay the Group IX and/or Group XI loans, the Letters of Credit were to make up that difference to ensure debt service was paid to Group IX and Group XI. Thus, it was imperative that Defendants honor their representations and the disclosure obligations they agreed to per the terms of the Group IX and Group XI loan agreements so that appropriate corrections could be made to ensure compliance with the PPA, to work through the process under the Letters of Credit, or, in a worst-case scenario, to permit the parties to mitigate their losses.

54.    During the construction of the Project, CMB Export received periodic reports from the Cobra Defendants, which were merely duplicates of reports sent by SolarReserve under the Group IX loan. Those reports reflected that construction was moving forward as planned. In fact, contrary to those reports, construction was substantially behind and grossly subpar, all of which the Cobra Defendants failed to disclose, and was therefore unknown, to CMB Export. The Cobra Defendants never corrected the false reports, but rather sent copies of those false reports, which, Relator is informed and believes, and thereon alleges, the Cobra Defendants knew to be false.

55.    Due to construction delays and grossly deficient work, CTPI failed to meet the extended Provisional Acceptance Date in March of 2015, and missed important project milestones under the PPA. As a result, TSE refused to accept the

16

COMPLAINT

Project because it fell significantly short of pro forma operational capacity. Notwithstanding that Provisional Acceptance had not been achieved, and therefore that control of the Project had not been transferred from CTPI to TSE, TSE represented to the Treasury Department via a letter dated September 21, 2016, that control had been passed to TSE, and that the plant had been placed in service as of February 26, 2016.

56.    In fact, control of the Project was not transferred to TSE and Provisional Acceptance was not deemed achieved until December of 2016—approximately three years later than initially negotiated in the EPC Contract, and then only because TSE deemed the non-operational Project provisionally accepted so as to make the Project appear to meet the conditions for release of the cash grants from the Treasury Department. The deadline for the Project to obtain the cash grants—which totaled approximately $230 million—was January 1, 2017. In reality, at the time Provisional Acceptance was deemed achieved, CTPI had not satisfied the conditions precedent under the EPC Contract for Provisional Acceptance, as major defects existed that impaired the safe, reliable, normal and continuous operations of the plant.  Most notably, as of December of 2016, the Project was not operational, primarily as a result of a massive leak in the hot salt tank in October of 2016, which was caused by CTPI's defective work. The hot salt tank was the source of various malfunctions and other problems even prior to that date.

57.    Further compounding CTPI's failure to competently perform and complete its work on the Project under the EPC Contract, and despite the major design and construction issues at the Project, on December 22, 2016, Relator is informed and believes that TSE at the direction of the Cobra Defendants falsely certified to the DoE that CTPI had completed all work such that no unfinished work remained as of that date that would impair the safe, reliable, normal and continuous operations of the plant. However, excepted from this blanket statement was a vague reference to the defective hot salt tank, which rendered the plant non-operational.

4838-3775-0707.1

17

COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

This certification was made just days before the January 1, 2017, deadline for TSE to satisfy all conditions required to obtain the 1603 Cash Grants from the Treasury Department and before the repairs to the hot salt tank had been completed, which by CTPI's own estimates at that time, would not be completed until nearly 30 days after the 1603 Cash Grants deadline.

58.     Relator is informed and believes, and thereon alleges, that, notwithstanding the Provisional Acceptance, TSE and CTPI agreed that, at the time Provisional Acceptance was deemed achieved, significant work remained to complete construction on the Project so that it would be operational. Furthermore, at the time Provisional Acceptance was deemed achieved, more than 500 "punch list" items remained unresolved, totaling in the tens of millions of dollars, and included seven major plant deficiencies. Following delivery of the plant, TSE discovered more than 2,300 warranty claims, 1,140 of which remain unresolved. CTPI has refused to reimburse TSE for those claims or for reasonable and necessary repair costs.

59.     Relator is informed and believes, and thereon alleges, that although the Project did not meet the requirements for Provisional Acceptance, TSE granted Provisional Acceptance so as to receive the 1603 Cash Grants, with the full knowledge and encouragement of DoE and the Cobra Defendants, and with full knowledge that the representations made to the Treasury Department were not true and intending that the Treasury Department would rely on the representations in issuing the cash grants. For its part, SolarReserve agreed to premature Provisional Acceptance because the Cobra Defendants convinced it that the 1603 Cash Grants were necessary for the Project and they would be lost if TSE did not grant Provisional Acceptance.

60.     As a result of the delay in achieving Provisional Acceptance, TSE assessed CTPI liquidated damages in the amount of $93.4 million, the maximum amount available under the EPC Contract. However, those damages offset only a

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

fraction of the costs incurred by TSE during the delay and did not compensate for any lost profits caused by the delay.

61. The Cobra Defendants greatly benefited from premature Provisional Acceptance because it stopped the accrual of liquidated damages imposed due to the delay in obtaining Provisional Acceptance, and it shifted to SolarReserve responsibility for the Project's operations (and resulting requirement to show performance) with all the significant issues caused by CTPI's subpar construction. Prior to Provisional Acceptance, the EPC Contract and the PPA placed responsibility on CTPI to operate the Project. Relator is informed and believes, and thereon alleges, that, in obtaining the sham Provisional Acceptance, the Cobra Defendants sought to shift away from them blame for the Project's nonoperational status, knowing that the Project could not be operated by anyone as there were more than 500 "punch list" items that had to be remedied, in addition to major repairs relating to the hot salt tank.

62. Relator is informed and believes, and thereon alleges, that despite the fact that the Project was non-operational, had thousands of warranty claims that needed to be remedied, and was experiencing a serious environmental clean-up effort due to the hot salt tank leak contaminating the ground, TSE, with the assistance of the Cobra Defendants, SolarReserve and its subsidiaries represented to the U.S. Treasury that the Project was a green energy project that was under commercial operation and should receive the 1603 Cash Grants, all the while knowing that the project was inoperable and was contaminating the site.

63. Ultimately, the hot salt tank repair work was not completed until July 12, 2017, nearly one year after TSE represented to the Treasury Department that the Project had been placed in service and nearly seven months after TSE certified to the DoE that CTPI had completed its work under the EPC Contract. Moreover, more than a year after the December 2016 delivery, the punch list items that CTPI failed to complete and remained unresolved totaled at least $25 million, not including

4838-3775-0707.1

19

COMPLAINT

several items that had not been valued. As a result of all these defects, CTPI failed to meet the EPC Contract's Guaranteed Final Acceptance Date of December 22, 2017. In fact, to date, substantial amounts of CTPI's work under the EPC Contract remains incomplete and subpar, and the Project remains nonoperational, due to a second catastrophic failure of the hot salt tank causing it to leak requiring the replacement of the tank and extensive environmental cleanup.

64.    During the time CTPI operated it, the Crescent Dunes Project never achieved or even approached acceptable electricity output levels, and achieved just 50% of the guaranteed output levels in only two of the 14 months it operated the plant. And since the plant was turned over to TSE, it has either been nonoperational or has continued to fall short of performance metrics under the PPA due to CTPI's grossly negligent work and intentional refusal to make necessary repairs.

65.    Upon turnover to TSE, SolarReserve, as operator under the MSA, demanded that CTPI complete the punch list items, complete the warranty work and pay liquidated damages for its delays in obtaining Provisional Acceptance.

66.    Relator is informed and believes, and thereon alleges, that the Cobra Defendants, not wanting to show CTPI's failures, forced CTPI to draw on the letters of credit to pay liquidated damages rather than paying such liquidated damages out of pocket. However, the letters of credit were not intended to be utilized for liquidated damages.  And although CTPI was required to replenish the letters of credit once they were drawn upon, its replenishment obligation was capped at an amount lower than the initial letters of credit. Furthermore, Relator is informed and believes, and thereon alleges, that by funneling its funds as a replenishment of the letters of credit rather than paying such liquidated damages out of pocket, the Cobra Defendants were able to have their investment entity make the payment, and characterize the payment as an investment rather than a penalty for subpar construction under CTPI. Relator is informed and believes, and thereon alleges, that the Cobra Defendants also agreed to increase the replenishment cap knowing that

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

such increase would merely show as an increase in their investment, rather than as the result of negligent and subpar performance by CTPI.

67.   Most recently, in the summer of 2019, the hot salt tanks at the project suffered a second catastrophic failure, which caused ground contamination and required the removal and replacement of the salt tank that is essential to the plant's ability to generate any electrical power and function as designed. This, along with the defects in CTPI's performance under the EPC Contract that caused the continued inability of the Project to operate so that it could meet the thresholds set forth in the PPA or to be capable of being used for its intended purpose, caused NVE to declare an event of default under the PPA and triggered a 90-day period for TSE to cure the default. That 90-day cure period lapsed on October 3, 2019.  Upon the lapse of the cure period, NVE declared the PPA to be terminated. Subsequently, DOE declared the LGA to be in default due to the termination of the PPA.

68.   Relator is informed and believes, and thereon alleges, that at all times relevant to the matters alleged herein, the Cobra Defendants knew of the deficiencies in the construction and operation of the Crescent Dunes Project, yet failed to inform CMB Export of the same. Relator is further informed and believes, and thereon alleges, that the Cobra Defendants actively hid the construction defects at the Project through their scheme to pay liquidated damages using the letters of credit, pursuant to which it categorized its payments as investments rather than as liquidated damages, and by orchestrating the premature Provisional Acceptance of the Project. In hiding those issues, the Cobra Defendants deprived CMB Export of any opportunity to mitigate its losses or take other efforts to attempt to recover the indebtedness owed to it.

SolarReserve is Forced Out

69.   During its management of the Project after Provisional Acceptance was granted, SolarReserve discovered more deficiencies in CTPI's performance. Consequently, SolarReserve demanded that CTPI address the deficiencies

4838-3775-0707.1

COMPLAINT

SolarReserve knew about. SolarReseve further demanded that CTPI complete the punch list items and complete all warranty work, while completing the hot salt tank repair and related environmental cleanup.

70.     Relator is informed and believes, and thereon alleges, that to further their efforts to hide that CTPI was the cause of the Project's significant deficiencies, the Cobra Defendants began communicating with DoE, which was under a new administration, in an attempt to focus blame for the Project's delays and failures on SolarReserve, the newly installed operator. Relator is informed and believes, and thereon alleges, that the Cobra Defendants advised DoE that Cobra was the only entity that could fix the Project and get it operating at the thresholds required under the PPA. Relator is informed and believes, and thereon alleges, that DoE agreed to comply with the Cobra Defendants' requests, knowing that only the Cobra Defendants were able to pay off the DoE-guaranteed loan if the Project could not be fixed, and desiring to avoid backlash that would follow discovery that it authorized the sham Provisional Acceptance.

71.     Relator is informed and believes, and thereon alleges, that SolarReserve knew construction of the Project was faulty and that the Project could not reach the levels required under the EPC and PPA until all deficiencies were corrected, and therefore continued to point out CTPI's delays and failures, and even offered to make certain repairs to ensure the Project was operational. However, Relator is informed and believes, and thereon alleges, that DoE refused to authorize payment for such repairs, and the Cobra Defendants refused to reimburse any repairs SolarReserve did make. Thus, the Cobra Defendants and DoE conspired to set up SolarReserve to take full blame for the Project's failure.

72.     Relator is further informed and believes and on that basis alleges that as part of its ongoing effort to hide its involvement in the sham Provisional Acceptance (which permitted TSE and the Cobra Defendants to improperly obtain the 1603 Cash Grants), and to ensure that it had the cooperation of the Cobra Defendants,

4838-3775-0707.1

22

COMPLAINT

which claimed to be the only entity that could make the Project succeed so it would not show as another solar project failure for the DoE, and which was, in the worst case scenario, the only entity financially capable of repaying the DoE loan if the Project ultimately was unsuccessful, the DoE improperly sought to exercise greater and greater control over the project, TSE, and SolarReserve by manufacturing so-called "Events of Default" under the LGA, and on that basis began threatening to wrongfully exercise remedies under the LGA. Among other things, DoE refused to approve disbursements of loan proceeds so that SolarReserve could pay subcontractors performing work on the Project. However, DoE then declared SolarReserve's failure to pay those subcontractors to be events of default.

73. Based on these manufactured events of default, DoE threatened foreclosure of the Project unless SolarReserve resigned as operator of the plant. It made that threat even though SolarReserve operated the plant for less than twelve months, and the Project was operating only for approximately four of those months because of shutdowns caused by CTPI's subpar construction work. By forcing SolarReserve out, DoE sought to install its hand-picked operator as well as its two "independent" managers to the TSE board. DoE additionally required Kevin Smith to resign as the SolarReserve designated board manager, even though he had the most knowledge concerning the Project.

74. Ultimately, SolarReserve was terminated as operator and DoE installed FTI Consulting, which had little expertise in the operation of a power plant like the Crescent Dunes Project. As a result, the Project continued to experience poor performance and failed to meet performance metrics mandated under the PPA, and failed even to reach the performance metrics achieved by SolarReserve during its management and operation of the Project. Moreover, the Project now had additional financial strain placed on it due to payment of fees to FTI and additional fees paid to SolarReserve under the MSA because FTI was incapable of operating the Project on its own.

4838-3775-0707.1

23

COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

75. Relator is informed and believes, and thereon alleges, that through their concerted efforts, the Cobra Defendants and DoE accomplished what they set out to do: remove the more-vocal SolarReserve representatives and provide the Cobra Defendants with virtually unchecked control of the Project, all so that they could hide that CTPI was at fault for the Project's failures and that DoE had condoned—and actually encouraged—the sham Provisional Acceptance so that Cobra could obtain the 1603 Cash Grants from the U.S. Treasury on the DoE guaranteed loan, and to avoid embarrassment from another failed solar project.

76. Further compounding the harm done by the Cobra Defendants' scheme, in order to pay the exorbitant fees charged by FTI, CTPI drew down the letters of credit it represented to CMB Export were in place to ensure available liquidity to pay down indebtedness associated with the Crescent Dunes Project in the event completion of the Project was delayed or the Project did not perform as required under the PPA.

77. The DoE's actions removed from management of the Crescent Dunes Project the SolarReserve representatives with the independence, knowledge, and expertise necessary to manage the Crescent Dunes Project and remedy the defective work done by CTPI, and cure the defects that led to the default under the PPA.

78. Relator is informed and believes, and thereon alleges, that the Cobra Defendants, in concert with the DoE (which cooperated with the Cobra Defendants despite their obvious conflicts of interest), worked to prevent the exercise of TSE's rights against CTPI for its grossly negligent performance under the EPC Contract. As stated above, TSE is owned and controlled by TSEH II, which is owned and controlled by TSEH I, which is in turn owned and controlled by TSI. As SolarReserve and CEI each held a 50% membership interest in TSI, each could effectively veto the other in the event of a dispute. Prior to SolarReserve's ouster as manager, such veto was impossible because CEI was required to recuse itself from any decisions related to the CTPI's grossly negligent performance due to its

4838-3775-0707.1

24

COMPLAINT

conflicts of interest. Thus, SolarReserve, as manager, could pursue such claims as needed. After DoE forced SolarReserve's ouster, however, FTI, hired simply as the operator, did not make any progress in pursuing such claims.

CMB's Enforcement Efforts

79. In or about the second half of 2018, SolarReserve requested, and Group IX granted, several extensions to SR CSP's obligation to pay interest payments under the relevant loan documents. In November of 2018, the parties entered into discussions to restructure the indebtedness SR CSP owed to Group IX. It was after the discussions commenced regarding the request to restructure the indebtedness that Group IX first learned of SolarReserve's ouster from management of the Crescent Dunes Project and the operational and control issues related thereto, because neither SR CSP nor Cobra Finance had fulfilled their respective obligations to Group IX and Group XI, respectively, to disclose those developments. In fact, CMB Export and Group IX were not informed that SolarReserve was removed as the operator of the Crescent Dunes Project until on or about January 24, 2019, and then, the full extent of such maneuvering was not explained to CMB Export or Group IX until on or about February 25, 2019.

80. Relator is informed and believes, and thereon alleges, that Defendants intentionally hid these developments from Relator because they did not want Relator to exercise its rights and the rights of its limited partners under the relevant loan agreements they entered into with SR CSP and Cobra Finance. Relator is further informed and believes, and thereon alleges, that ACS and Cobra Instalaciones directed Cobra Finance to withhold this information so as to ensure CTPI could avoid having an event of default declared under the EPC Contract and, by extension, the Cobra Defendants' various obligations owed to the various lenders of the Crescent Dunes Project called due, the performance of which was unconditionally guaranteed by ACS.

81. Subsequently, after CTPI initiated arbitration against TSE, TSE

4838-3775-0707.1

25

COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

asserted counterclaims against CTPI for breaches of the EPC Contract, which led to settlement discussions. TSE and CTPI ultimately agreed to settle the claims against each other in exchange for Cobra's payment to TSE of $146,800,000. That amount should have been liquidated damages based on CTPI's faulty performance and breach of the EPC Contract, but the parties agreed to treat it as a convertible note. As a result, any cash flow from the Project not being used to pay the DoE guaranteed loan would go to the Cobra Defendants, leaving SolarReserve without any revenue to pay the Group IX loan. SolarReserve was pressured into agreeing to such settlement through Cobra's payment to SolarReserve of $6 million for a change order that was related to SolarReserve's repair work for CTPI's subpar performance. The $6 million was likely to be the only payment to SolarReserve as TSE did not want to continue to fight the arbitration. Relator is informed and believes, and thereon alleges, that DoE was prepared to approve such settlement until the second catastrophic hot salt tank leak occurred. To date, no resolution has occurred on this arbitration proceeding.

82. Because of SR CSP's and Cobra Finance's repeated failures to keep Group IX, Group XI, and CMB Export informed of the change in management of TSE and indeed concealment of such information from Group IX, Group XI, and CMB Export, the various claims between the related parties, the utter failure of the Project, and the threatened and ongoing litigation related to the Crescent Dunes Project, Group IX, Group XI, and CMB Export had no ability to discover the true state of affairs with TSE or the Crescent Dunes Project. Thus, on August 5, 2019, in order for Group IX, CMB Export, and SolarReserve to obtain greater visibility into the Project and its management and operation, SolarReserve exercised its rights under the TSE operating agreement and named Troy Taylor as the SolarReserve designee on the TSE board of managers, replacing Lee Bailey. Although SolarReserve had the absolute right to replace its designated manager on the TSE Board of Managers, TSE, through its "independent" manager, Mark Mansky, and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

counsel, demanded that SolarReserve to obtain upstream consents regarding the change in SolarReserve's appointee.

83.     Relator is informed and believes, and thereon alleges, that Mr. Mansky is acting on behalf of the Cobra Defendants. Mr. Mansky in fact advised Group IX that it should accept pennies on the dollar for its claims against the Cobra Defendants.

84.     SolarReserve viewed this process to obtain upstream consents to be unnecessary, costly, and in bad faith. Ultimately, it took approximately 45 days for the consents to be executed and for Mr. Taylor to replace Mr. Bailey on the TSE board of managers.

85.     On September 17, 2019, just days after the consents were executed for Mr. Taylor to replace Mr. Bailey on the TSE board of managers, and after Mr. Taylor began asking questions relating to CTPI's grossly negligent work, DoE sent a "Notice of Default" letter to TSE, advising of purported Events of Default under the LGA and that DoE was exercising its rights under the DoE Financing Documents. DoE also directed TSEH II, the entity holding 100% of the membership interest in TSE, to "cease and desist from taking any action purporting to exercise the voting, consensus, and other powers of ownership pertaining to the Pledged Collateral."

86.     Relator is informed and believes, and thereon alleges, that DoE, with the approval and cooperation of the Cobra Defendants, took those improper measures in order to prevent TSE from placing the Crescent Dunes Project into bankruptcy, and to stop questioning the Cobra Defendants' action and the related discovery of DoE's complicit actions in permitting this failed project to move forward and receive the 1603 Cash Grants improperly to avoid the negative press of another failed solar project. Relator is informed and believes, and thereon alleges, that the Cobra Defendants orchestrated this series of events so that it could force SolarReserve out of, and obtain sole and exclusive ownership and control of, the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Crescent Dunes Project.

87.    As of September 20, 2019, the Crescent Dunes Project remains shut down due to the second catastrophic failure of the hot salt tank, with no scheduled date for completion of repairs to the hot salt tank. Projections are that the hot salt tank replacement and environmental remediation may not be finished until Spring 2020. There is no longer a power purchase agreement in place, and thus even if the Project was operational, there is no buyer for any electricity generated by the Project.    Relator is informed and believes, and thereon alleges, that TSE is effectively insolvent with no realistic prospect of generating revenues, thereby rendering SR CSP incapable of repaying its indebtedness to Group IX.

## FIRST CAUSE OF ACTION

### (False Claims – Against All Defendants)

88.    Relator incorporates by reference as though fully set forth herein the allegations contained in each and every paragraph of this Complaint.

89.    TSE's application to the Treasury Department for $230 million in cash grants under the American Recovery and Reinvestment Act constitutes a claim as defined by 31 U.S.C. § 3729.

90.    By submitting to the Treasury Department written confirmation that the Project had been placed in service as of February 26, 2016, Relator is informed and believes that TSE and the Cobra Defendants made or caused to be made false statements to the Treasury Department. Relator is further informed and believes, and thereon alleges, that Defendants made the statement knowing it was false or at least recklessly and in deliberate ignorance of the statement's truth or falsity.

91.    Relator is informed and believes, and thereon alleges, that Defendants made the statement intending to induce the Treasury Department to rely on its representation.

92.    As a result of Defendants' false statement and certification, the Treasury Department did, in fact, issue cash grants in the approximate amount of

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

$230 million, to the direct benefit of TSE and the Cobra Defendants.

## SECOND CAUSE OF ACTION

### (Conspiracy to Present False Claims – Against All Defedants)

93.    Relator incorporates by reference as though fully set forth herein the allegations contained in each and every paragraph of this Complaint.

94.    Relator is informed and believes, and thereon alleges, that CTPI, CEI, and the other Cobra Defendants named herein, conspired with each other and with TSE in submitting false statements to the Treasury Department. CTPI, CEI, and the other Cobra Defendants named herein knew of the substantial defects caused by CTPI's defective work under the EPC Contract, attempted to cover up those defects from the Project's creditors, and directed the officers and employees of TSE to submit false statements to the Treasury Department in order to induce the Treasury Department to issue the cash grants.

95.    As a result of Defendants' conspiracy and submission of false claims to the Treasury Department, the government has been defrauded of at least $230 million.

## PRAYER FOR RELIEF

Wherefore, as a result of the foregoing allegations, Relator prays for judgment in their favor as follows:

1.    For a judgment against Defendants for their submission of false claims to the government, in an amount to be proved at trial, but estimated to be approximately $230,000,000, and for treble damages as permitted under the False Claims Act;

2.    For a judgment awarding punitive damage against Defendants;

3.    For an order adjudging that Relator is entitled to its costs of suit incurred herein;

4.    For an order adjudging that Relator is entitled to recover its attorneys' fees, as allowed by applicable law;

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-3775-0707.1

29

COMPLAINT

5.    For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 29, 2020

LEWIS BRISBOIS BISGAARD & SMITH LLP

By _____

JOHN S. POULOS
Nevada Bar No. 15085
2020 W. El Camino Ave., Suite 700
Sacramento, CA 95833
Tel. 916.564.5400

Attorneys for Relator CMB EXPORT, LLC, a Texas limited liability company

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-3775-0707.1

30

COMPLAINT