JOHN S. POULOS
Nevada Bar No. 15085
  E-Mail: John.Poulos@lewisbrisbois.com
TIMOTHY J. NALLY
*pro hac vice application pending*
  E-Mail: Timothy.Nally@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
2020 W. El Camino Ave., Suite 700
Sacramento, CA 95833
TELE: 916.564.5400
FAX: 916.564.5444

CAMI M. PERKINS
Nevada Bar No. 9149
  E-Mail: Cami.Perkins@lewisbrisbois.com
MATTHEW A. CAVANAUGH
Nevada Bar No. 11077
  E-Mail: Matthew.Cavanaugh@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 South Rainbow Blvd., Suite 600
Las Vegas, NV 89118
TELE: 702.893.3383
FAX: 702.893.3789

Attorneys for Relator CMB EXPORT,
LLC, a Texas limited liability company

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES ex rel. CMB EXPORT, LLC, a Texas limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>TONOPAH SOLAR ENERGY, LLC, a Nevada limited liability company, COBRA ENERGY INVESTMENT, LLC, a Delaware limited liability company, COBRA ENERGY INVESTMENT FINANCE, INC., a Delaware corporation, COBRA INDUSTRIAL SERVICES, INC., a Delaware corporation, COBRA THERMOSOLAR PLANTS, INC, a Nevada corporation, COBRA INSTALACIONES Y SERVICIOS S.A., a Spanish corporation, ACS SERVICIOS COMUNICACIONES Y ENERGIA, S.L., a Spanish corporation, | CASE NO. 2:20-cv-00196-JCM-MDC<br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                    1
SECOND AMENDED COMPLAINT

COBRA CONCESIONES, S.L., and
DOES 1 through 50, inclusive,

Defendants.

## INTRODUCTION

1.      This litigation concerns false claims for cash grants made in connection with the construction and operation of a solar thermal power plant project located in Tonopah, Nye County, Nevada (the "Plant" or the "Project"). At the times relevant to the matters alleged herein, the Project was owned by Tonopah Solar Energy, LLC, a Delaware limited liability company ("TSE"), and is referred to herein as the Crescent Dunes Project or, simply, the Project.

2.      The Crescent Dunes Project was constructed by Defendant Cobra Thermosolar Plants, Inc., a Nevada corporation ("CTPI"), and at the times relevant to the matters alleged herein was owned and operated by affiliates of CTPI and SolarReserve, Inc. ("SolarReserve"). CTPI's obligations with respect to the construction of the Project are set forth in that certain Contract for the Engineering, Procurement and Construction of the 110 MW Nominal Capacity Thermosolar Electrical Generation Facility In Tonopah, Nevada, USA by and between Tonopah Solar Energy, LLC and CTPI, dated September 20, 2011 (the "EPC Contract")

3.      To fund construction and operation of the Crescent Dunes Project, SolarReserve, through its indirect subsidiary SolarReserve CSP Finance, LLC, and Defendant Cobra Energy Investment Finance, LLC ("Cobra Finance"), an affiliate of CTPI and an indirect subsidiary of ACS Servicios Comunicaciones y Energia, S.L., obtained loans from CMB Infrastructure Investment Group IX, L.P. ("Group IX") and CMB Infrastructure Investment Group XI, L.P. ("Group XI"), respectively, in the aggregate total principal amount of $170 million.  At all times relevant to the matters alleged herein, Relator CMB Export, LLC ("Relator" or "CMB Export") was general partner of Group IX and Group XI. Each of those loans was evidenced by a loan

2

SECOND AMENDED COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

agreement setting forth the various obligations SolarReserve CSP Finance, LLC, owed to Group IX ("the Group IX Loan Agreement") and Cobra Finance owed to Group XI ("the Group XI Loan Agreement"). The loans from Group IX and Group XI were in addition to a loan in the approximate original principal amount of $715 million that TSE obtained from the Federal Financing Bank ("FFB") through the United States Department of Energy ("DoE") loan guaranty program, and pursuant to which FFB funded, and DoE guaranteed, that loan pursuant to the Loan Guaranty Agreement ("LGA").

4.      Part of the business plan of the Project, and as required by the LGA, TSE was to obtain certain cash grants from the U.S. Department of Treasury under Section 1603 of the American Recovery and Reinvestment Tax Act ("1603 Cash Grants"). This lawsuit is focused on the 1603 Cash Grants.  As described more fully herein, Defendants failed to fully disclose the true faulty condition of the Project (unquestionably a result of numerous errors and gross negligence in CTPI's engineering and construction of the Crescent Dunes Project, as well as CTPI's operation of the Project prior to turning control over to TSE), when seeking hundreds of millions of dollars from the Department of Treasury.  Indeed, prior to applying for the 1603 Cash Grants, the Project had already failed to meet—or even come close to meeting—its electrical power generation requirements under the PPA, and had been offline for significant periods of time due to construction being incomplete and major defects existing in key components of the Plant, including but not limited to a significant leak in the Plant's Hot Salt Tank.

5.      Indisputably, CTPI is responsible for having partially constructed and prematurely delivered a grossly defective, non-functioning power plant, yet CTPI. Relator is informed and believes, and on that basis alleges, that the Defendants manipulated the Project development, construction, operations, and commissioning processes to secure the 1603 Cash Grants, withholding from the Treasury Department

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

material information about the Project's true condition and operational status.

6.     Relator is informed and believes, and thereon alleges, that in order to avoid losing ownership in and control of the Project, affiliates of Cobra Finance and CTPI attempted to foist onto TSE, as the Project owner, a partially and poorly constructed, fundamentally deficient solar power plant with more than 9,000 distinct defects (which were combined to show only as 500 punch list items), in addition to seven major deficient items that affected the safe and regular use of the Plant.  The defects were so extensive and severe that the Plant could not operate safely, reliably, normally and continuously in accordance with the requirements of the EPC Contract, Applicable Laws and Prudent Industry Practices, as those terms are defined in the EPC Contract. Therefore, Provisional Acceptance, a critical milestone in the Project's construction under the EPC Contract, could not be achieved. CTPI (and its parents and affiliates), SolarReserve, Banco Santander S.A. ("Santander") and DoE therefore agreed to amend the EPC Contract to deem "Provisional Acceptance" achieved because the extensive defects caused by CTPI prevented the Project from passing the key performance tests necessary for Provisional Acceptance, as required under the original EPC Contract, to actually be achieved according to the standards set out in the EPC Contract.  That same deeming of Provisional Acceptance admitted that the Project was not yet fully constructed or operational.  However, achieving Provisional Acceptance was a crucial step for the Project to maintain eligibility for the 1603 Cash Grants.

7.     Thereafter, TSE assumed control of the Project, upon which it discovered more than 2,000 additional warranty claims (which should have been punch list items but for the fact that they were not discovered until after Provisional Acceptance was deemed achieved) arising from inadequate, incomplete, or defective labor, services, materials and equipment furnished by CTPI and other Cobra affiliates. The Project was, as a result of CTPI and its affiliates' gross negligence and willful

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

misconduct, doomed to failure.

8.    Relator is informed and believes, and thereon alleges, that as part of their fraudulent and calculated scheme, CTPI, Cobra Finance, and their affiliates, manipulated circumstances surrounding the Project so that Provisional Acceptance, which consisted of an extensive series of contractually defined benchmarks and checkpoints the Project had to meet before operation of the Project would pass to TSE, would occur before those benchmarks and checkpoints were actually met, and subsequently withheld from the Treasury Department the true state of affairs at the Project, so that they could, *inter alia*, obtain the benefit of the 1603 Cash Grants and other tax incentives from the United States government.

## THE PARTIES AND RELATED ENTITIES

9.    Relator CMB Export is a limited liability company organized and existing under the laws of the state of Texas. Until 2016, CMB Export was organized and existed under the laws of the state of California. CMB Export is, and at all times relevant to the matters alleged herein, was the general partner of both Group IX and Group XI. Reference to CMB Export shall hereinafter refer to it in its capacity as general partner of Group IX and/or Group XI, and as relator in the herein alleged claim under the False Claims Act.

10.    Relator is informed and believes, and thereon alleges, that Defendant TSE is a Delaware limited liability company with its principal place of business in Nevada.

11.    Relator is informed and believes, and thereon alleges, that Defendant Cobra Energy Investment, LLC ("CEI"), is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Las Vegas, Nevada. At the times relevant to the matters alleged herein, CEI was a 50% member of TSI. Relator is informed and believes, and thereon alleges, that, at

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the times relevant to the matters alleged herein, CEI was a wholly-owned subsidiary of ACS Servicios Comunicaciones Y Energia, S.L.

12.    Relator is informed and believes, and thereon alleges, that Defendant Cobra Finance is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Houston, Texas.

13.    Relator is informed and believes, and thereon alleges, that Defendant CTPI is a corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Houston, Texas.

14.    Relator is informed and believes, and thereon alleges, that Defendant Cobra Instalaciones y Servicios S.A. ("Cobra Instalaciones") is a Sociedad Anonima organized and existing under the laws of Spain, with its principal place of business in Spain, and is an indirect parent company of CTPI, Cobra Finance, and CEI.

15.    Relator is informed and believes, and thereon alleges, that Defendant ACS Servisios Comunicaciones Y Energia, S.L., ("ACS") is a Sociedad de Responsabilidad Limitada organized and existing under the laws of Spain, with its principal place of business in Spain and is the direct parent company of Cobra Instalaciones.

16.    Relator is informed and believes, and thereon alleges, that Defendant Cobra Concesiones, S.L. ("Cobra Concesiones") is a Sociedad de Responsabilidad Limitada organized and existing under the laws of Spain, with its principal place of business in Spain and is an affiliate of the other Cobra Defendants named herein. Collectively, Cobra Finance, CEI, CTPI, Cobra Instalaciones, ACS, and Cobra Concesiones shall hereinafter be referred to as "the Cobra Defendants".

17.    Relator is informed and believes, and thereon alleges, that at the times relevant to the matters asserted herein, ACS, through its chief financial officer, and Cobra Concesiones, through its chief executive officer and chief financial officer, oversaw and directed the Cobra Defendants' participation in the Crescent Dunes

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                                        6
SECOND AMENDED COMPLAINT

Project.

18.    Defendants Does 1-50, inclusive, are sued in this Complaint under fictitious names. Their true names and capacities are unknown to Relator. When their true names and capacities are discovered, Relator will amend this Complaint by inserting their true names and capacities herein. Relator is informed and believes, and thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint, and that the damages Relator asserts herein were proximately caused by those Defendants. Relator lacks further information at this time concerning the true identity of these fictitiously named defendants, but will amend this complaint when such further information is discovered.

19.    Relator is informed and believes, and thereon alleges that, at all material times herein Defendants, and each of them, are joint and contributing tortfeasors who either acted in concert to accomplish a common purpose, agreement or plan, and were the agents, servants, principals, employees, co-conspirators or alter egos of one or more of the other Defendants, and acted with the other Defendants' knowledge, consent, and approval and within the course and scope of that agency, employment or conspiracy. As such, each of the Defendants is responsible for the liabilities of the other Defendants, as alleged herein.

## VENUE AND JURISDICTION

20.    Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, as this complaint asserts claims under the Federal False Claims Act.

21.    Venue in this court is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732, as certain of the Defendants are located in this district and as a substantial portion of the matters alleged herein occurred in this district.

## FACTS

22.    Group IX and Group XI are entities formed for investment opportunities

139341927.1

7

SECOND AMENDED COMPLAINT

under the EB-5 Immigrant Investor Program under the Immigration Act of 1990, which allows foreign investors to make certain minimum investments into business ventures in the United States on the condition that each such investment creates at least ten jobs in the United States over a certain period of time. The foreign investors apply for conditional permanent residence in this country, and, if all conditions are met, including sustaining the investment at risk for the required period of time, apply to remove conditions on their residency status. CMB Export is general partner of both Group IX and Group XI.

23. SolarReserve is a U.S.-based developer of utility-scale solar power projects. It developed the concept and technology underlying the Crescent Dunes Project, which uses concentrated solar power and molten salt technology to generate electricity.

Overview of the Project

24. The Crescent Dunes Project (and the technology it utilizes) was designed so that numerous mirrors concentrate sunlight at a solar tower, referred to as the Receiver Assembly, which collects and transmits the massive amount of heat generated by the concentrated sunlight to molten salt passing through a system of pipes referred to as the Downcomer to a Hot Salt Tank below the solar tower, where the hot salt is used to generate steam, which powers turbines that generate electricity for delivery into the power grid. As designed, the molten salt in the Hot Salt Tank functions as a heat storage receptacle so that the solar power plant can remain operational and generate electricity even in the absence of sunlight. To function properly, the Project requires highly complex mechanisms to position thousands of mirrors in precisely the right way so as to focus maximum sunlight at the tower and collect optimal amounts of heat.

25. SolarReserve, acting as a subcontractor to CTPI, was responsible for supplying the Receiver Assembly and related software program, which generally

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                    8
SECOND AMENDED COMPLAINT

functioned as intended. The balance of the Plant, including operation, design, engineering, and construction to provide a "turnkey" solar power plant, was the responsibility of CTPI.

The Project's Genesis

26.    SolarReserve, LLC ("SR LLC"), a direct and wholly owned subsidiary of SolarReserve, caused the Certificate of Formation of TSE to be filed with the Delaware Secretary of State on or about February 25, 2008. The stated purpose of TSE as set forth in its initial Limited Liability Company Agreement dated March 3, 2008, executed by SR LLC as TSE's then-sole member, included "to acquire, develop, permit, finance, construct, own, and operate a solar thermal project" and to engage in any and all other activities necessary or incidental thereto.

27.    Given the complexity of the Project's concept and design, its construction required significant funding. To meet those funding requirements, SolarReserve sought debt financing under a U.S. government loan program whereby the FFB made loans guaranteed by the DoE in support of certain types of renewable energy projects. Through the DoE loan guaranty program, FFB agreed to fund the majority of the Project's construction, but, inter alia, required SolarReserve to (a) obtain additional funding to cover remaining development costs; (b) bring into the Project a construction contractor with expertise in the construction of electrical power plants; and (c) procure a purchaser of the electricity to be generated by the Project.

28.    To satisfy the FFB's and DoE's prerequisites, SolarReserve entered into contractual relationships with NVE, certain Cobra subsidiaries and affiliates, and CMB Export, respectively. The discussions and negotiations leading to the various contractual relationships began in approximately 2009 and culminated with the execution of various agreements in the autumn of 2011.

The SolarReserve-Cobra Relationship

29.    The relationship between SolarReserve and the Cobra entities is

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                                    9
SECOND AMENDED COMPLAINT

memorialized in various agreements, including the limited liability company operating agreements of various special purpose entities relating to the direct and indirect ownership and management of the business affairs of TSE—the direct owner of the Crescent Dunes Project—as well as agreements regarding the construction, maintenance and operation of the Tonopah Solar Energy 110 MW Concentrating Solar Power Plant comprising the Crescent Dunes Project.

30. The foundational concept of the various contractual arrangements between SolarReserve and the Cobra Defendants was that the two parties would, through their indirect subsidiaries, function largely as 50/50 equity members in TSI, the indirect parent of TSE, with each of SolarReserve CSP Holdings and CEI having the right to appoint an equal number of designees who together would constitute TSI's board of directors. That board of directors would indirectly control essentially all material management decisions of Tonopah Solar Energy Holdings I, LLC, and Tonopah Solar Energy Holdings II, LLC, the indirect and direct parent companies (respectively) of TSE, and would also have veto rights with respect to essentially all material decisions of the TSE board of directors.

31. In connection with the formation of TSI, CTPI executed the EPC Contract for the Project and therefore controlled and was directly responsible, as EPC Contractor, for the engineering, procurement and construction of what was supposed to be a "turnkey" Project. Under the EPC Contract, until Provisional Acceptance (as defined therein) was achieved, CTPI was responsible for operation and maintenance of the Project. Thereafter, SolarReserve would be responsible for operation of the Project under a Management Services Agreement ("the MSA"). Thus, from approximately 2011 until December of 2016, CTPI had complete and sole care, custody, and control over the Project.

32. In December of 2016, via the artifice of Amendment No. 3 to the EPC Contract, CTPI, TSE, and the DoE "deemed" Provisional Acceptance under the EPC

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

SECOND AMENDED COMPLAINT

Contract to have been achieved, notwithstanding that the contractually defined checkpoints and milestones that were included in the EPC Contract to ensure CTPI delivered a fully constructed and operational power plant were never actually achieved. Amendment No. 3 clearly and explicitly indicates that the Plant was neither fully constructed nor operational. Nonetheless, Amendment No. 3 waived the checkpoints and milestones, and permitted CTPI to transfer operation of the Project to TSE just days before the deadline to satisfy all conditions for receiving the 1603 Cash Grants expired but before the Project was placed in service. In fact, to date, the Project has never been capable of being used for its intended purpose.

33.   The relationship between SolarReserve and the Cobra entities with respect to their participation in the management and control of the Project is memorialized in the Second Amended and Restated Limited Liability Agreement of Tonopah Solar Investments, LLC, dated December 22, 2014 ("the TSI LLC Agreement"). Per the TSI LLC Agreement, SolarReserve CSP Holdings, LLC, and CEI, each hold a 50% membership interest in TSI, with management rights fully vested in the two members. At the times relevant to the matters alleged herein, SolarReserve CSP Holdings, LLC, was a wholly-owned subsidiary of SolarReserve CSP Finance, LLC ("SR CSP"), which was a wholly-owned subsidiary of SR LLC, which was a wholly-owned subsidiary of SolarReserve.

34.   Through their joint ownership of TSI, SolarReserve and the Cobra Defendants jointly controlled TSE through multiple holding companies. Specifically, at the times relevant to the matters alleged herein, Tonopah Solar Energy Holdings I, LLC ("TSEH I"), generally managed Tonopah Solar Energy Holdings II, LLC ("TSEH II"), with both holding companies governed by their respective LLC agreements. Pursuant to those agreements, the TSEH II board of directors was to be composed of up to six directors and, if required by DoE under the Loan Guaranty Agreement, one additional "Independent Director". Santander appointed one director,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                    11
SECOND AMENDED COMPLAINT

and TSI appointed four directors, two of which were designated by SolarReserve and two of which were designated by Cobra. In or about May of 2018, upon DoE's insistence, the board of managers was reconstituted with two independent managers (appointed by the DoE), a SolarReserve appointee, and a Cobra appointee. Thus, SR CSP and CEI each held a 50% membership interest in TSI, which in turn controlled TSEH I, which controlled TSEH II, which controlled TSE, the operating entity of the Crescent Dunes Project.

35. Although various subsidiaries of each entity were involved, the decision-making authority for the engineering, construction and operation resided with CTPI, as the EPC contractor, until the Project was deemed to have achieved Provisional Acceptance and control was turned over to TSE in December of 2016. Thereafter, TSE utilized FTI to operate the Project, with SolarReserve managing the Project pursuant to the MSA. Kevin Smith was the CEO of SolarReserve at the time the Project was turned over to TSE. At the times relevant to the matters alleged herein, Cristobal Gonzalez, chief financial officer of ACS, was Cobra's appointee to the board of managers of TSE.

The Construction and Operating Contracts

36. On or about November 4, 2009, TSE and NVE entered into the PPA, pursuant to which TSE agreed to sell, and NVE agreed to purchase from TSE, electricity generated by the Crescent Dunes Project for the Nevada power grid over a 25-year term. Under the PPA, NVE agreed to pay rates favorable to TSE for the duration of the PPA.

37. Because the technology underlying the project was the first of its kind, NVE negotiated certain construction checkpoints that were designed to ensure that the project would be operational and generating power per the terms of the PPA. Specifically, the PPA required the Crescent Dunes Project to be operational within four years after the PPA received necessary regulatory approval to commence

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

12

SECOND AMENDED COMPLAINT

construction of the Crescent Dunes Project. It also required the Plant to achieve certain electrical generation levels and demonstrate that it could generate power at those levels on a continuous basis. The tests and project milestones were formulated to ensure satisfactory progress and timely completion in the construction of the Project as a "turnkey project".

38.     In or about September of 2011, TSE entered into the EPC Contract with CTPI, pursuant to which CTPI agreed to engineer, procure equipment for, construct, and commission the Crescent Dunes Project as a turnkey project.

39.     Under the EPC Contract, CTPI was obligated to, among other things, design the Plant, develop technical documentation, carry out engineering services, and promptly correct any deficiencies in its work and bear the cost of any necessary repair work in connection with the same, and perform its work in a manner to successfully comply with the specifications and performance metrics and within the timeframes set forth in the PPA. The EPC Contract provided for liquidated damages if CTPI failed to achieve certain key milestones. CTPI warranted that the construction would be completed properly and ACS unconditionally guaranteed CTPI's performance. If there were any issues with the construction of the Project, CTPI is contractually obligated to remedy the issue.

40.     The EPC Contract imposed certain timeframes CTPI was required to meet. Specifically, CTPI was required to attain Provisional Acceptance—which was to be measured by a series of detailed conditions and performance tests specified in the EPC—no later than 30 months after it received notice from TSE to commence work on the project. Ultimately, the Provisional Acceptance deadline was extended multiple times after CTPI repeatedly demonstrated its inability to meet the original deadline. Provisional Acceptance was not "deemed" achieved until nearly 33 months after the original deadline, and, even then, it did not meet the requirements for Provisional Acceptance as provided in the original EPC Contract.  Rather, the EPC

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

SECOND AMENDED COMPLAINT

Contract had to be amended to deem Provisional Acceptance achieved despite the Plant not being fully constructed or operational.

41.     To achieve Provisional Acceptance, CTPI was also required to complete its work under the EPC Contract, including correction of any item that may impair the safe, reliable, normal and continuous operation of the Plant in accordance with the EPC Contract's requirements, Applicable Laws and Prudent Industry Practices as defined in the EPC Contract—and such items, by the terms of the EPC Contract, could not be the subject of a punch list, the repair or correction of which might be put off until after Provisional Acceptance.

42.     Under the terms of the EPC Contract, Provisional Acceptance would not be deemed achieved until CTPI completed Performance Verification and the Plant achieved at least the Minimum Values during Performance Verification. Among other tests, the EPC Contract required CTPI to satisfy a five-day production test before Provisional Acceptance would be deemed achieved.

43.     Control and operation of the Plant would not be delivered to TSE until the date of Provisional Acceptance, and until then, the Project would remain under the exclusive operation and control of CTPI.

44.     CTPI was required to achieve Guaranteed Final Acceptance—that is, completion of all work under the EPC Contract—within one year of Provisional Acceptance. Achieving Final Acceptance required CTPI to pass various performance verification tests, including a Continuous Performance Measurement ("CPM") test, the parameters of which are defined in the EPC Contract. The CPM test period commenced upon Provisional Acceptance and would be met upon TSE confirmation that the Plant generated energy for a period of twelve consecutive months at a level that meets or exceeds the Expected Production (as defined in the EPC Contract) for that twelve-month period. However, if the Expected Production was not met in any month during the CPM test period, CTPI agreed to pay "CPM Payments" to TSE for

14

SECOND AMENDED COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the electricity production shortfall. The CPM Payments were intended to provide cash flow to TSE to cover debt servicing and other operational expenses in the event the Plant was not generating sufficient electricity per the PPA.

45. CTPI was also required under the EPC Contract to deliver to TSE and SolarReserve monthly written status reports, and to attend and participate in monthly meetings with TSE for the purpose of discussing the status of its work on the Project and anticipating and resolving problems.

46. CTPI's performance under the EPC Contract was unconditionally guaranteed by ACS.

47. Around the same time as CTPI and TSE entered into the EPC Contract, TSE and SR LLC entered into the MSA, pursuant to which SR LLC agreed to manage certain administrative functions of the Crescent Dunes Project for an initial term of ten (10) years, subject to an indefinite number of five (5) year extensions. Relator is informed and believes, and thereon alleges, that DoE required SR LLC to manage the Project as SolarReserve did not have the conflicts of interest that the Cobra entities had, namely, the Cobra entities were equity members and CTPI was the EPC Contractor, whereas SolarReserve entities were only equity members. Relator is further informed and believes, and thereon alleges, that DoE was initially concerned about Cobra and Santander acting in concert and therefore believed that SR LLC was the only true independent party involved in the Project.

The Lending Structure

48. In or about the autumn of 2011, TSE obtained funding necessary to proceed with the development of the Crescent Dunes Project. The funding from the FFB totaled in excess of $700 million, and was memorialized by the LGA. The LGA imposed certain requirements on TSE in order to induce the DoE to issue the guaranty necessary for the procurement of the funding. Among other requirements, the LGA required TSE to submit an application for the 1603 Cash Grants.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

49.     Section 1603 provides cash grants for specified energy properties, in amounts up to 30% of the basis of the property, that were either placed in service in 2009 or 2010, or placed in service after 2010 and before January 1, 2017, but only if construction commenced in 2009 or 2010. Property is considered "placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function . . . ." 26 C.F.R. § 1.167(a)-11(e)(1).

50.     TSE was required to submit an application for a cash grant under section 1603 within 180 days of the earliest possible "placed in service" date.

51.     In obtaining the DoE guaranty, both SolarReserve and CEI were required to make certain financial covenants, including making base equity contributions and providing letters of credit to supplement funding of the Crescent Dunes Project, as well as making certain indemnity payments to TSE in order for TSE to pay various costs and expenses associated with the Crescent Dunes Project.

Construction and Operation of the Project

54.     TSE's performance under the PPA with NVE was central to the vitality of the Crescent Dunes Project.

55.     Selling electricity to NVE pursuant to the PPA was the economic premise for the Plant. The PPA allowed TSE to sell electricity to NVE at rates substantially above market rates. NVE agreed to pay \$134.95/MWh for electricity generated by the Project, whereas market rates at one point were estimated to be approximately \$24/MWh.

56.     The PPA required TSE to supply NVE a minimum of 485 GWh of power over a rolling 24-month period commencing in January 2017. Defendants knew from the outset of their involvement in the Project that once Provisional Acceptance was achieved, the Plant would need to satisfy the PPA's supply level requirement, the failure of which would constitute an event of default under the PPA.

57.     Relator is informed and believes, and thereon alleges, that Defendants

SECOND AMENDED COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

knew at all times that their failure to perform under the EPC Contract and the PPA would effectively render the Project a complete disaster, as failure to properly construct the Plant would result in a breach of the PPA, which would in turn give NVE cause to terminate the PPA and eliminate the only contemplated revenue source of the Project—and critical to Defendants at the time—would also prevent the Project from qualifying for the 1603 Cash Grants.

58.    The Cobra Defendants consistently withheld material information regarding their difficulties constructing an operational Plant. The Cobra Defendants reported to stakeholders that construction and commissioning were moving forward as planned, and failed to disclose that the Project in fact was suffering from several major design and construction flaws—due to incomplete or defective work by CTPI—that limited the Plant's electricity generating capacity.

59.    In fact, contrary to those reports, construction was substantially behind and grossly subpar, all of which the Cobra Defendants failed to disclose. Among other things, the reports stated that construction and commissioning were 95% (or more) complete when in fact extensive work was still required to get the Plant online and generating electricity reliably and consistently. While CTPI may have spent approximately 95% of the budgeted hours it anticipated would be required to complete construction and commissioning, it required substantially more work than budgeted to complete its work and to correct errors in the work performed. The statements regarding percentage of construction and commissioning completed rendered the reports at least grossly misleading if not outright false.The Cobra Defendants never corrected their reports, which, Relator is informed and believes, and thereon alleges, the Cobra Defendants knew to be false and misleading.

60.    In fact, due to construction delays and grossly deficient work, CTPI failed to meet the extended Provisional Acceptance Date and missed important project milestones under the PPA, all of which were hidden from various stakeholders.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                    17
SECOND AMENDED COMPLAINT

61.   The delays in the Project's construction and commissioning stemmed from CTPI's poor performance as EPC Contractor nearly from commencement of its work under the EPC Contract. The troubles began when CTPI failed to implement and follow a schedule, which is a basic element of any construction project.  CTPI was contractually obligated to submit and adhere to a construction schedule.  Despite numerous requests from representatives of TSE and DoE, CTPI repeatedly failed to provide a schedule.  Unsurprisingly, CTPI did not meet any of the deadlines required of it under the EPC Contract.  In fact, CTPI removed its first project manager from the project due to his failure to timely achieve Provisional Acceptance.

62.   CTPI also began making changes to the design and plans for the Plant almost immediately upon commencement of its work.  However, shortly after TSE issued notice to commence work on the Plant, CTPI sourced the heliostats from another supplier. The heliostat design CTPI opted for called for larger and fewer heliostats than the original design. Under the original design, which was supplied by SolarReserve, the heliostat field was to consist of approximately 17,000 heliostats. CTPI opted to use heliostats that were larger than those designed by SolarReserve, which had been tested and approved by the DoE. CTPI's design resulted in a heliostat field having 10,347 heliostats that surround the Received Assembly.

63.   The heliostat field control system ("HFCS") is a software system responsible for controlling the 10,347 heliostats at the Plant that are supposed to direct sunlight to the Receiver as part of the process for generating solar energy.  Each heliostat consists of a foundation and a pedestal, with mirrors and equipment for moving the mirrors mounted on the pedestal.  While not complex, the pouring of the foundations and installation of the pedestals required engineering.  But work on the foundations was delayed while CPI finalized its proposal to include a smaller number of larger heliostats, as described above, and this contributed to Cobra's failure to timely install the heliostats.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

64.     Work on the first foundation for the heliostats should have commenced by December 2011, but did not actually begin until August 2012, nearly one year after execution of the EPC.  In order to maintain the original project schedule, installation of the heliostats should have been completed by April 2013, but they were not completed until April 2014.

65.     Other Cobra-related issues caused delays in completion of the heliostat field. For example, the HFCS was intended to function with that original design.  The redesigned heliostats required SolarReserve to reprogram the HFCS to fit with the redesigned heliostats. As a result, CTPI and SolarReserve were modifying the HFCS as late as 2016-2017, during the commissioning phase of the Plant.

66.     Cobra's installation of the heliostats at the Plant did not meet the requirements for safe and efficient application of sunlight onto the receiver assembly. There were several safety issues, including several catastrophic failures where heliostats crashed into the pedestals which severely damaged equipment and could have injured or killed personnel.  This was due to design deficiencies in the elevation drives supplied by a CTPI-selected supplier.

67.     There were also efficiency and performance concerns with CTPI's work on the HFCS, primarily due to pointing errors caused by the elevation drives and improper canting of individual mirror facets. Those pointing errors required programing changes to make the heliostats work more efficiently.

68.     CTPI's modified heliostats also made washing them regularly very difficult, which caused a reduction in reflectivity and reduced the amount of flux on the Receiver and reducing the ability to produce maximum power.  Thousands of mirror facets also developed cracks after installation in the solar field.  This was due to improper shipping racks that transported the facets from their manufacturing point in Las Vegas, NV to the Crescent Dunes Project in Tonopah, NV.

69.     CTPI also developed a solar field power system at the Plant that was

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

undersized and resulted in the loss of electrical power.  This resulted in damage to the receiver on one occasion where there was a loss of power and there was no way to off-point the heliostats.  While there were multiple causes to the resulting damage to the receiver, the undersized power system was a proximate cause.

70.    CTPI's incomplete and defective work as EPC Contractor also showed in the system of pipes it designed and installed to transport molten salt through the Receiver Assembly to the Hot Salt Tank. That system of pipes, referred to as the downcomer, contained the vessels through which the molten salt moved to and from the receiver, where it was heated and then flowed to the Hot Salt Tank for storage. The Receiver system includes downcomer valves that control the flows of the molten salt in the pipes that transport the molten salt from the cold salt tank to the top of the receiver tower and then to the Hot Salt Tank.

71.    In or about early 2015, CTPI discovered significant vibration and movement occurring in the downcomer piping system while molten salt was passing through, which posed major safety and operational issues to the Plant.  The cause of the vibration was the fact that the downcomer system needed to maintain a molten salt pressure containment boundary and provide a means for dissipation of the potential energy of the molten salt due to the elevation head above the liquid level in the tanks below.  Due to the nature of a solar facility, the system operates in a cyclical manner, resulting in molten salt temperatures ranging between ambient temperatures at a minimum and the hot salt at the upper end.

72.    One of the consequences of designing a system that must operate over a range of temperatures is a requirement to account for the thermal expansion of system materials. However, CTPI, which was responsible for the design of the downcomer system, failed to perform a dynamic load study prior to utilizing the modified downcomer system it initially installed at the Plant, which is standard industry practice. Had it done so, it would have discovered the errors in its design that lead to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the vibration and pipe movement. It was not until May of 2015 that CPI acknowledged that its subcontractor failed to perform a proper dynamic load analysis of the downcomer system and the system needed to be redesigned to stop the vibrations.

73.    The initial downcomer design, which was proposed by SolarReserve but was modified by CTPI, was to utilize periodically spaced orifice plates that would absorb this potential energy in steps as the salt flows down the downcomer and forced through multiple restrictions.  The restriction orifices dissipate or convert potential energy into kinetic energy, resulting in fluid at the outlet of the orifices as a low-pressure, high velocity stream. The receiver system was designed to have a steady load and no movement or vibration of the valves, pipes, and supports for the pipes.

74.    Where the downcomer piping, elbows or orifice plates are impacted by the flowing fluid momentum, ideally piping supports anchor the system such that receiver structure tower resists the force of this momentum.  If the downcomer piping system is not adequately anchored, the fluid momentum will force movement in the piping.  When the movement force is constant and continuous, the pipe will deflect, similar to compressing a spring. The pipe has the potential to deflect until the momentum force equals the spring force of the piping.

75.    The primary operating issue with the downcomer valves is the excessive vibrations and risks that the vibrations will cause damage to the valves, pipes and piping support. The downcomer valve issues caused the receiver system to trip or cutoff so that the vibrations would not cause damage to the system. After being tripped, the system needed to be reset to allow operations to continue.

76.    Excessive vibrations in the downcomer system arose before the Plant could generate electricity. The earliest tests of the salt system occurred in November 2014 and involved running water through the system.  Excessive vibration of the downcomer valves and pipes was observed.  In November 2014, vibrations in the system occurred during water testing of the cold tank system.  CTPI downplayed the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

21

finding, noting that water and molten salt have different densities and this difference was why there was vibration when water was run through the receiver system. However, that theory was proved wrong in March 2015, when the vibrations continued when molten salt liquids were run through the system. As a result, CTPI undertook to redesign the downcomer system.

77.     CTPI believed that the downcomer's existing design, in which molten salt cascaded through the system of pipes, was causing the vibrations and recommended redesigning the downcomer so that the Receiver tower would operate so that the pipe system was partially flooded with molten salt.  In the partially-flooded operating mode, the riser and pipes are filled with molten salt, which needs to be maintained at a certain level in the downcomer.

78.     Operating in flooded mode negatively impacted Plant performance, as it prevented the Receiver system from optimizing collection of sunlight.  In the original design that involved cascade flow, the molten liquid salt would drop and would be slowed by orifices approximately every 100 feet in the Tower, allowing the Receiver to operate in a temperature control mode where the salt liquid is heated in the System to the efficient high temperature before being released for transport down to the Hot Salt Tank.  That presented an easier system to automate because the heliostats tracked the sun and move relatively slowly.

79.     To implement the desired change to flooded mode, CTPI enlisted SolarReserve. The first phase of the redesign contemplated limiting maximum flow rate to 53% of operational capacity, and the second phase required modification of the existing downcomer fill valve and the addition of a new flow control valve in the downcomer to actively control the standing salt level in the downcomer on a permanent operating basis.

80.     CTPI's modifications to the downcomer system resulted in subpar performance. The heliostats were designed to operate by the HFCS.  Information

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

regarding temperature and sunlight is transmitted from the HFCS to the Heliostat Control Unit.  Based on the information, the heliostat tracks the sunlight and directs sunlight to the Receiver Tower.  Modifying the downcomer to operate in a flooded mode instead of a cascade mode required the heliostats to no longer track to temperature control and required them to be adjusted manually to ensure sufficient liquid salt would be in the pipes at all times under the flood fill operating mode.  The change in operating mode reduced the efficiency of the receiver system.

81.    Much of the redesign and reinstallation work on the downcomer occurred between July 2015 and June 2016.  CTPI conducted a design review and ordered new valves with pneumatic actuators in 2015, but the vibration issues continued until they could be installed.  To avoid the vibrations, the Receiver System needed valves with hydraulic actuators.

82.    The excessive vibrations in the downcomer adversely impacted electrical production.  But rather than acknowledge it specified the wrong valve actuator, CTPI, working with its vendor, tried to tune the new values installed in November of 2015 and into early 2016.

83.    CTPI's poor performance also extended to the Plant's distributed control system ("DCS"), the software system that was supposed to automate much of the Plant's functions and thereby allow the Plant to operate with minimal staff on site.  However, CTPI's failure to properly design, test, and install the DCS resulted in thousands of alarms triggering each day, indicating some sort of error in Plant performance, which required extensive work to address and rectify the cause of the alarms.

84.    The excessive number of DCS alarms illustrates the deficiencies in the DCS system.  The issue was extreme during CTPI's tenure as Plant operator, prior to Provisional Acceptance.  During 2016, there were over 765,000 DCS alarms with nearly 4,800 alarms each day. This high number of nuisance alarms occurred because

SECOND AMENDED COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the DCS was poorly designed and was not properly tested in the factory. The high number of nuisance alarms was dangerous and made the Plant extremely difficult to operate with alarms sounding every few seconds during some periods.

85. The problems with the DCS that trace back to CTPI's procurement practices. CTPI failed to design and test the DCS Control Logic System ("CLS") prior to installing it at the Plant. Such testing is often done as part of a Factory Acceptance Test, which CTPI failed to properly undertake. After initial testing, CTPI continued to modify the CLS but did not subject the modified CLS to additional Factory Acceptance Testing, as would be typical. The result is that CTPI installed a CLS with numerous errors which only began to be discovered following Provisional Acceptance.

86. The issues concerning the downcomer valve vibrations and heliostat availability were compounded by the deficient DCS system. As discussed above, CTPI recommended operating the receiver tower system in flood fill mode, rather than temperature control mode as planned. The DCS system did not have the flexibility to allow adjustments to the changes in how the Receiver System had been operated without impacting electricity output. The change in operating mode impacted how the heliostats must be operated and track sunlight during the day.

87. The high number of alarms kept the operators from being able to prioritize and respond promptly to issues because with so many alarms sounding during the day, and they could not determine whether a real issue had arisen or a false alarm had sounded. Several issues that CTPI contended were operator error resulted, in part, from having too many alarms sounding each day.

88. To conceal the manifold delays and defects in the Project's construction, many milestones specifically outlined in the contracts for the construction and operation of the Project were not actually achieved, but rather the parties "negotiated" the waiver of those milestones even though they did not initially meet the required

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

24

SECOND AMENDED COMPLAINT

conditions in the applicable agreement, so that the Project would appear "on paper" to be progressing as planned, even though construction was far behind where it needed to be.

89. Moreover, Relator is informed and believes, and thereon alleges, that the parties manipulated the performance tests outlined in the PPA and the EPC Contract so that they could report that the Plant had satisfied those tests when, in reality, the tests were never actually performed as contemplated and outlined in the PPA and the EPC Contract.

90. The first of such waivers occurred in late 2014. The PPA was scheduled to terminate on December 31, 2014, due to an event of default caused by CTPI's failure to timely achieve Commercial Operation per the PPA. Its failure to timely achieve Commercial Operation stemmed in large part from the issues CTPI caused with respect to the heliostat field and the downcomer systems. The termination was subject to 360-day cure period, TSE had until December 26, 2015, to cure the default by achieving Commercial Operations.

91. To achieve Commercial Operations under the PPA, and trigger NVE's obligation under the PPA to purchase electricity generated by the Plant at an above-market rate, the Plant was required to meet all performance tests set forth in the EPC Contract and pass a four-hour performance test. If Provisional Acceptance had not been achieved at the time of Commercial Operations, the Plant operator was to certify that the conditions for Commercial Operations were met.

92. On or about November 11, 2015, CTPI certified that the Plant satisfied the four-hour test on November 9, 2015. Thereafter, on or about November 16, 2015, TSE forwarded CTPI's certification of the four-hour test to NVE and suggested that all requirements for Commercial Operation were satisfied. However, by letter dated November 20, 2015, NVE disputed that Commercial Operation requirements had been met because CTPI had not met the five-day production test required under the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

EPC Contract required for Provisional Acceptance.

93.     On or about November 24, 2015, approximately one month prior to the expiration of TSE's cure period to achieve Commercial Operation, TSE, CTPI, and NVE met to discuss the PPA termination and whether Commercial Operations could be "deemed" achieved under the PPA.  After negotiations between TSE, CTPI, and NVE, Commercial Operations was deemed to have been achieved on November 9, 2015, at the conclusion of the four-hour test, even though the five-day production test set out in the EPC Contract was not satisfied. The agreement was memorialized in Amendment No. 3 to the PPA, which was dated December 27, 2015, one day after TSE's cure period expired.

94.     However, after the Plant passed the four-hour test in November of 2015, it was shut down in December 2015 and part of January 2016 to allow CTPI to complete and correct its work. CTPI continued with its construction, repairs and modifications of the Plant because Provisional Acceptance under the EPC Agreement had not been met.  The gross negligence and incompetence of CTPI in constructing the Plant had been in full display for many years by this time.

95.     Although Commercial Operation had been "deemed" achieved, the vibration issue in downcomer pipe had not been fixed despite it being first identified in 2015.

96.     Furthermore, the solar field remained incomplete and poorly functioning, requiring constant readjustments due to CTPI's ad hoc heliostat design change.

97.     In addition to the downcomer issues and the heliostat issues, rather mundane balance-of-plant construction items, such as various pump installations throughout the Plant, suffered as well. For example, the Plant's pumps were not properly aligned and commissioned, which later resulted in 60% of the Plant's pumps prematurely failing in the first year of the Plant's operations. As a result of the various

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                          26
                        SECOND AMENDED COMPLAINT

deficiencies in CTPI's work and its overall failure to complete construction of the Plant in accordance with the EPC Contract, through June of 2016, the Plant failed to achieve more than 32 percent of its expected output.

98.   For these and related reasons, TSE refused to provisionally accept the Plant, knowing that CTPI's performance was grossly subpar and that CTPI had not, to that point, designed and constructed a Plant that could safely, reliably, normally and continuously operate in accordance with the requirements of the EPC Contract, Applicable Laws and Prudent Industry Practices. TSE refused to provisionally accept the Plant, even as the December 31, 2016, deadline for 1603 Cash Grants approached.

99.   CTPI's failure to achieve Provisional Acceptance under the EPC Contract posed a significant issue to Defendants because TSE had been repeatedly advised by its tax and legal advisers that Provisional Acceptance was the most likely date the Plant would be deemed to have been placed in service.

100.   Notwithstanding that Provisional Acceptance had not been achieved, and therefore that control of the Project had not been transferred from CTPI to TSE, TSE, in connection with CTPI and other Defendants, represented to the Treasury Department via a letter dated September 21, 2016, that control had been passed to TSE, and that the Plant had been placed in service as of February 26, 2016.

101.   In fact, as of February of 2016, approximately 2,000 of the roughly 10,000 heliostats called for in the construction and operation of the Plant were unavailable, which not only significantly reduced the amount of electricity the Project was capable of generating, but also prevented performance tests of the receiver, demonstrating that the Project had not been placed in service as of February of 2016. Moreover, the tests that could be performed in February of 2016 had to be manipulated so as to achieve on paper the necessary thresholds to pass such performance tests. Relator is informed and believes and thereon alleges that, had the tests not been manipulated, the Project would have failed the tests. Understandably,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

TSE would not accept the Project be turned over to it given the status of the Project in February of 2016.

102. Then, in October of 2016, CTPI discovered a leak in the Hot Salt Tank, which caused molten salt to spill onto the ground and contaminate the Plant. Relator is informed and believes, and thereon alleges, that the leak was caused by CTPI's faulty installation of the tank, which restricted the tank's ability to expand in response to the extreme heat from the molten salt. The leak represented yet another significant instance in a long line of errors in CTPI's performance as EPC Contractor.

103. The leak in the Hot Salt Tank was described by CTPI as a small leak when in fact over 5 million tons of salt leaked causing the Plant to cease electrical generation while CTPI performed a root cause analysis and began work to remedy the defect. This is but one example of CTPI downplaying significant events and not keeping stakeholders apprised of the actual condition of the Plant. Thus, the Plant generated no electricity from the time the leak was discovered in October of 2016 until mid-2017, nearly 10 months after the leak was first discovered.

104. Part of the delay in completing the Hot Salt Tank repairs stemmed from hazardous NOx emissions that emitted from the Hot Salt Tank's foundation once molten salt was reintroduced to the tank, causing a reaction between the molten salt and the foundation. CTPI's gross negligence yet again shone in their decision to install an undersized NOx removal system against better advice from TSE. The Hot Salt Tank leaked again in March 2019, resulting in an extended Plant outage.

105. The Hot Salt Tank leak was not yet fixed as of December 22, 2016, and the parties knew at that time that repairs would not be completed before the cash grants expired. In fact, the plant was not able to generate any electricity due to the Hot Salt Tank leak until well after January 1, 2017, the date TSE's eligibility for 1603 Cash Grants expired. At that time, the Plant still had not achieved Provisional Acceptance and, as a result, care, custody, and control of the Plant still resided with

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

CTPI.

106.   Care, custody, and control of the Project was not transferred to TSE until December 22, 2016—approximately three years later than initially required in the EPC Contract and nine days before the deadline for satisfying all 1603 Cash Grant requirements. CTPI transferred control at that time only after extensive negotiations between TSE and CTPI pursuant to which TSE "deemed" the non-operational and fundamentally deficient Project provisionally accepted despite CTPI's failure to complete major work on the Project necessary for its safe, reliable, normal and continuous operations.  In its communications to the Treasury Department, TSE, at the direction and encouragement of CTPI, omitted material information about CTPI's historical and ongoing design, construction, and operational failures that resulted in a Project that was incapable of meeting its contractually-required performance metrics.

107.   Even though the Plant did not meet the requirements under the EPC Contract for Provisional Acceptance, CTPI and TSE attempted to effectuate transfer in care, custody and control by entering into Amendment No. 3 to the EPC Contract. While Amendment No. 3 deemed Provisional Acceptance achieved, it also specifically recognized that construction of the Plant was incomplete.  Relator is informed and believes, and thereon alleges, that Amendment No. 3 was never provided to the Treasury Department, thus the Treasury Department was never told that despite Provisional Acceptance having been granted, albeit by deeming it to have occurred, the Plant was not fully constructed or operational and, therefore, that construction work remained uncompleted that prevented the safe, reliable, normal and continuous operations of the Plant.

108.   Relator is informed and believes, and thereon alleges that TSE and CTPI entered into Amendment No. 3 to make the Project appear, on paper, to meet the conditions for release of the cash grants from the Treasury Department, including to satisfy the requirement that TSE, as the tax payer, had control of the Plant. Under the

EPC Contract, care, custody, and control of the Plant would not pass from CTPI to TSE until Provisional Acceptance. However, Defendants knew that transfer of control to the tax payer was a material consideration for the Plant to be deemed "placed in service" under relevant Treasury regulations.

109.   Relator is further informed and believes, and thereon alleges, that each of the Cobra Defendants was represented in the negotiations between TSE and CTPI, and used their influence and control over CTPI and TSE to ensure that Amendment No. 3 was agreed to so that the 1603 cash grants would be received.

110.   On the date of Amendment No. 3, the CTPI, the other Cobra Defendants, and TSE all knew that the Project barely achieved 50 percent or more of expected output in only two months during the 14 months since Commercial Operations was deemed achieved, and that the Project was shut down in October 2016 to allow CTPI to repair the Hot Salt Tank leak and complete other essential work and critical repairs.

111.   Pursuant to Amendment No. 3, Provisional Acceptance was deemed achieved (even though the Plant had been nonoperational since October 2016) and included an extensive "Major Punch List" that included numerous items that were incomplete and impaired the safe, reliable, normal and continuous operations of the Plant. The seven Major Punch List items identified in Amendment No. 3 were as follows:

   a.   The Open Loop Cooling Pumps cavitate at the suction inlet connection detected by noise and vibration, requiring the reinstallation of new Open Loop Cooling Pumps. Repairs were anticipated to be completed by December 31, 2016.

   b.   The water pretreatment facility fails to remove silica from the raw water to the degree required for Plant operations, prompting the redesign of the water treatment system to add an additional stage of silica removal. Repairs were anticipated to be completed by July 13, 2017.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

SECOND AMENDED COMPLAINT

c.    The potable water system did not meet the Nevada Bureau of Safe Drinking Water requirements for a non-community, non-transient potable water system, requiring installation of two new well pumps and a new potable water filtration system. Repairs were anticipated to be substantially completed by January 31, 2017.

d.    The superheater in steam generation train no. 1 had leaks in the union tube plate weld, requiring the replacement of the superheater. Repairs were anticipated to be completed by June 14, 2017.

e.    Heliostats had facets with slope angle values out of specification levels, requiring the readjustments of an estimated 3,000 heliostats. Repairs were anticipated to be completed by August 31, 2017.

f.    Water was found inside of the outer tube subset of the elevation drive in some of the heliostats, requiring the modification of the drives on all 10,374 heliostats. Repairs were anticipated to be completed by January 31, 2017.

g.    Hot salt leaking from the skirt of the Hot Salt Tank, requiring the draining, inspection and analysis, repair and refilling of the Hot Salt Tank with molten salt. Repairs were "anticipated" to be completed by January 30, 2017. Yet repairs were not and took another approximately seven months to July 2017.

111.    Importantly, the deadline for the Project to obtain the cash grants—which totaled approximately $275 million—was January 1, 2017, and Provisional Acceptance needed to be achieved before that date in order for TSE to realize the 1603 Cash Grants. In reality, at the time Provisional Acceptance was deemed achieved, CTPI had not satisfied the conditions precedent under the EPC Contract for Provisional Acceptance. Rather, SolarReserve and the Cobra Defendants executed Amendment No. 3 precisely because the January 1, 2017, deadline was looming and they knew that Provisional Acceptance had to be achieved by that deadline to avoid TSE losing eligibility for the 1603 Cash Grants.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

SECOND AMENDED COMPLAINT

112. After receiving TSE's 1603 cash grant application, Treasury asked whether control of the Plant had passed to TSE. In response, TSE represented that it had control of the Plant, but failed to disclose that Provisional Acceptance had not been achieved and that, under the EPC Contract, care, custody, and control of the Plant remained with CTPI because TSE refused to accept the Plant as constructed to that point by TSE.

113. Further compounding CTPI's failure to competently perform and complete its work on the Project under the EPC Contract, and despite the major design and construction issues at the Project, on December 22, 2016, by entering into Amendment No. 3, TSE certified that CTPI had completed all work such that no unfinished work remained as of that date that would impair the safe, reliable, normal and continuous operations of the Plant. However, excepted from this blanket statement was a reference to a "Punch List," which acknowledged that the Hot Salt Tank leak impaired the safe, reliable, normal and continuous operations of the Plant and that repairs would not be completed until after January 1, 2017, Relator is informed and believes that Defendants knew that January 1, 2017, was not a realistic date for construction work to repair the Hot Salt Tank leak to be completed.

114. Amendment No. 3 was executed just days before the January 1, 2017, deadline for TSE to satisfy all conditions required to obtain the 1603 Cash Grants from the Treasury Department and before the repairs to the Hot Salt Tank had been completed, which by CTPI's own estimates at that time, would not be completed until nearly 30 days after the 1603 Cash Grants deadline. In fact, the repairs to the Hot Salt Tank and installation of related systems, which were required due to the hazardous emissions resulting from the Hot Salt Tank leak, the status of which at the time of Amendment No. 3 was explicitly stated prevented the safe, reliable, normal and continuous operations of the Plant, were not completed until July of 2017, over seven months after TSE's eligibility for 1603 Cash Grants expired.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

32

SECOND AMENDED COMPLAINT

115. Notwithstanding the extensive issues surrounding the Plant, TSE and CTPI agreed that, at the time Provisional Acceptance was deemed achieved, significant work remained to complete construction on the Project so that it would be operational. Furthermore, at the time Provisional Acceptance was deemed achieved, the unresolved "punch list" items totaled over 9,000 items with the financial obligation to finish and repair in the tens of millions of dollars, including the cost of repairs to resolve the seven Major Punch List items. Following delivery of the Plant, TSE discovered an additional 2,300 warranty claims, 1,140 of which remain unresolved.

116. Among the deficiencies discovered after Provisional Acceptance was deemed achieved were errors and defects in the DCS, which was supposed to render the Project fully automated, limiting staff and allowing the Project to operate with maximum efficiency, including by facilitating the heliostats tracking sunlight during the day without human intervention or inefficiencies. However, CTPI procured equipment and designed the DCS in a subpar manner and without properly testing it. The deficient DCS rendered the Project unsafe and impossible to operate as designed.

117. Relator is informed and believes, and thereon alleges, that although the Project did not meet the requirements for Provisional Acceptance, TSE and the Cobra Defendants agreed that Provisional Acceptance would need to be deemed achieved so that TSE would receive the 1603 Cash Grants and so that control over the Project would turn over to TSE and cut off CTPI's ever-increasing liability under the EPC Contract, and appease the Project's lenders so that no event of default would be declared. Due to CTPI's failure to achieve Provisional Acceptance by the deadline in the EPC Contract, it incurred liquidated damages in excess of $93 million.

118. Relator is informed and believes, and thereon alleges, TSE and the Cobra Defendants entered into Amendment No. 3 to the EPC Contract with the full knowledge and encouragement of DoE. CTPI, TSE, and the other Cobra Defendants

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

were fully aware that the representations TSE made to the Treasury Department supporting its application for the 1603 cash grant were not true or complete, that material information was withheld from the Treasury Department, and that such representations and nondisclosures were intended to induce the Treasury Department to issue the cash grants. Relator is informed and believes, and thereon alleges, that neither Amendment No. 3 nor the reasons for it were ever disclosed to the Treasury Department.

119.   TSE, based upon CTPI's certification in its Commissioning Report dated July 29, 2016, represented to the Treasury Department that the Plant was placed in service (required to be eligible for the 1603 Cash Grants) on February 26, 2016, after conclusion of the five-day performance test required under the EPC Contract.  In the same July 29, 2016, Commissioning Report, CTPI stated that "care, custody, and control" of the Plant would be transferred from CTPI to TSE on August 5, 2016. However, care, custody, and control was not transferred to TSE on August 5, 2016. In fact, care, custody, and control was not transferred to TSE until TSE and CTPI entered into Amendment No. 3 on December 22, 2016, as a result of extensive negotiation between TSE and the Cobra Defendants to deem Provisional Acceptance achieved under the EPC Contract and even though the parties expressly acknowledged that the Major Punch List items, including the Hot Salt Tank leak, prevented the Plant from actually satisfying the prerequisites for Provisional Acceptance.

120.   The Treasury Department questioned if February 26, 2016, was the correct placed-in-service date.  However, TSE and the Cobra Defendants failed to disclose to the Treasury Department that TSE refused to accept the Project because of the Project's failure and inability to continuously be available for production of electric power due to numerous, serious design and/or mechanical defects.

121.   Relator is informed and believes, and thereon alleges, that the Cobra Defendants were apprised of each step of the 1603 Cash Grant Application process

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

34

SECOND AMENDED COMPLAINT

pursued by TSE, that Cobra participated in that process (and often delayed or withheld information to be provided to the Treasury Department), and that, well in advance of TSE's submission of its 1603 Cash Grant Application and supporting materials to the Treasury Department, the Cobra Defendants were provided copies of the application and supporting materials for review and comment.

122. Following TSE's submission of its 1603 Cash Grant Application, the Treasury Department requested additional information, clarification, and answers to numerous questions as part of a comprehensive due diligence. The Cobra Defendants were provided with all such communications and participated in preparation of some of the responses, including responding to requests from the Treasury Department for explanation of the numerous delays and cost overruns attendant to CTPI's performance under the EPC Contract, as well as support for the basis of various items of investment by Cobra used in development of the cash grant application. Defendants' responses failed to correct its previously misleading disclosures regarding CTPI's failure to satisfy the conditions for Provisional Acceptance, namely, that the Project failed to operate safely, reliably, normally and continuously in accordance with the requirements of the EPC Contract, Applicable Laws and Prudent Industry Practices.

123. Relator is informed and believes, and thereon alleges, that Defendants knew that disclosure of the true circumstances surrounding the Project would have precluded a determination that the Plant had been placed in service so as to qualify for the 1603 Cash Grant. Defendants knew that, prior to the sham Provisional Acceptance, the Project surpassed 50 percent of expected output in only two of the 14 months since Commercial Operation had been deemed achieved. During that time period, the Plant generated only 25.5 percent of the expected output. Defendants also knew that, for at least the first several months following the sham Provisional Acceptance, the Project would not generate any electricity. In fact, over the 24 months

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

35

SECOND AMENDED COMPLAINT

following the sham Provisional Acceptance, the Project averaged only approximately 26 percent of the production level required under the PPA.

124. Relator is informed and believes, and thereon alleges, that Defendants knew that at a minimum, Provisional Acceptance, the date when the Plant would be turned over to TSE, would be required for the Plant to be considered "placed in service," a condition for obtaining the 1603 Cash Grant. However, Defendants and DoE did not agree that Provisional Acceptance occurred on February 26, 2016, as represented in TSE's cash grant application. In fact, when CTPI attempted to provide notice that it achieved Provisional Acceptance in May of 2016, TSE and DoE disputed that Provisional Acceptance had been achieved. Only after extensive negotiation took place did the parties deem Provisional Acceptance to have occurred on December 22, 2016, less than ten days before the 1603 Cash Grants were set to expire.

125. For its part, SolarReserve agreed to premature Provisional Acceptance because it knew that the 1603 Cash Grants were necessary for the Project and they would be lost if TSE did not grant Provisional Acceptance. Furthermore, prior to Provisional Acceptance, CTPI had nearly paid the maximum amount of liquidated damages under the EPC Contract for its failure to timely achieve Provisional Acceptance in accordance with the EPC Contract, which meant that, once CTPI had reached the cap on liquidated damages, TSE would not have any meaningful cash flow to service it significant debts and operating costs until Provisional Acceptance was achieved and the 1603 Cash Grants were paid out.

126. Defendants also knew that, if TSE lost eligibility for the 1603 Cash Grants, the DoE would declare an event of default under the LGA and that TSE would likewise terminate the EPC Contract, which would expose CTPI and ACS to substantial liability.

127. As a result of the delay in achieving Provisional Acceptance, TSE assessed CTPI liquidated damages in the amount of $93.4 million, the maximum

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

SECOND AMENDED COMPLAINT

amount available under the EPC Contract. However, those damages offset only a fraction of the costs incurred by TSE during the delay and did not compensate for any lost profits caused by the delay.

128. The Cobra Defendants greatly benefited from premature Provisional Acceptance because it shifted to TSE responsibility for the Project's operations (and resulting requirement to show performance) with all the significant issues caused by CTPI's subpar construction. Prior to Provisional Acceptance, the EPC Contract and the PPA placed responsibility on CTPI to operate the Project. Relator is informed and believes, and thereon alleges, that, in obtaining the sham Provisional Acceptance, the Cobra Defendants sought to shift away from them blame for the Project's nonoperational status, knowing full well that due to the numerous and significant "punch list" items that had to be remedied, in addition to seven major repairs, including repairs relating to the Hot Salt Tank, in reality the Project could not be successfully operated by anyone.

129. Relator is informed and believes, and thereon alleges, that despite the fact that the Project was non-operational, had thousands of punch list and warranty claims that needed to be remedied, and was experiencing a serious environmental clean-up effort due to the Hot Salt Tank leak, TSE, with the assistance of the Cobra Defendants, SolarReserve and its subsidiaries, and DOE represented to the U.S. Treasury that the Project was a green energy project that had been placed in service and should receive the 1603 Cash Grants, all the while knowing that the Project was incomplete, inoperable and was contaminating the site because of the hot salt leaking into the ground. Furthermore, Relator is informed and believes, and thereon alleges, that despite the Project not having been placed in service, TSE claimed depreciation deductions relating to the Plant, and ultimately monetized the Plant's depreciation in a tax equity transaction even though the Plant had not been placed in service and therefore did not qualify for depreciation.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

37

SECOND AMENDED COMPLAINT

130. Ultimately, the Hot Salt Tank repair work was not completed until July 12, 2017, over a year after the date TSE represented to the Treasury Department the Project had been placed in service and nearly seven months after TSE certified that CTPI completed its work under the EPC Contract. Moreover, more than a year after the sham Provisional Acceptance, the punch list items that CTPI failed to complete and remained unresolved totaled at least $25 million, not including thousands of defective items that had not been valued.

131. As a result of all the errors and defects in the Project caused by its grossly deficient performance, CTPI failed to meet the EPC Contract's Guaranteed Final Acceptance Date of December 22, 2019. In fact, at that time, substantial amounts of CTPI's work under the EPC Contract remained incomplete and subpar, and the Project was nonoperational due to a second catastrophic failure of the Hot Salt Tank causing it to leak and requiring the replacement of the tank and extensive environmental cleanup.

132. During the time CTPI operated it, the Crescent Dunes Project never achieved or even approached electricity output levels CTPI and ACS guaranteed under the EPC Contract and called for under the PPA. In fact, the Crescent Dunes Project never generated enough electricity required under the PPA, resulting in the termination of the PPA and rendering the Project commercially unviable. The Project never generated 500 GWh/year over a 12-month period as required by the EPC Contract, never achieved the expected output in any given month, and achieved just 50% of the guaranteed output levels in only two of the 14 months CTPI operated the Plant after Commercial Operation up to Provisional Acceptance. And since the sham Provisional Acceptance, the Project was either nonoperational or, if operating, continuously fell far short of performance metrics under the PPA due to CTPI's grossly negligent work and intentional refusal to make necessary repairs. The following chart compares actual to the projected output for each month of operation

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

38

SECOND AMENDED COMPLAINT

from October 2015 (PPA COD) through November 2018. The chart also shows the reduced output attributable to CTPI's defective work, including relating to the Hot Salt Tank:



133.   Upon turnover to TSE, SolarReserve, as TSE's manager under the MSA, demanded that CTPI complete the punch list items, complete the warranty work and pay liquidated damages for its delays in obtaining Provisional Acceptance. CTPI refused to pay Continuous Performance Measurement payments owed under the EPC Contract or make the requisite repairs to make the Project operational.

134.   In the summer of 2019, the Hot Salt Tank at the project suffered a second catastrophic failure, which caused ground contamination and required the removal and replacement of the salt tank. This, along with the defects in CTPI's performance under the EPC Contract that caused the continued inability of the Project to operate so that it could meet the thresholds set forth in the PPA or to be capable of being used for its intended purpose, caused NVE to declare an event of default under the PPA

SECOND AMENDED COMPLAINT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

and triggered a 90-day period for TSE to cure the default. That 90-day cure period lapsed on October 3, 2019. Upon the lapse of the cure period, NVE declared the PPA to be terminated. Subsequently, DOE declared the LGA to be in default due to the termination of the PPA. As a result of the loss of the PPA, TSE filed chapter 11 bankruptcy proceedings in mid-2020. The resulting reorganized entity that emerged from bankruptcy is wholly-owned by ACS, and the DoE agreed to forgive more than $255 million under the LGA , resulting in even more detriment to the US government.

135.    Relator is informed and believes, and thereon alleges, that at all times relevant to the matters alleged herein, the Cobra Defendants knew of the deficiencies in the construction and operation of the Crescent Dunes Project, yet failed to fully inform its stake holders or the Treasury Department of the impact of such deficiencies. Relator is further informed and believes, and thereon alleges, that the Cobra Defendants actively hid the construction errors and defects at the Project through their scheme to orchestrate the premature Provisional Acceptance of the Project and failure to present accurate information to relevant government entities as required by the 1603 Cash Grant application.

## FIRST CAUSE OF ACTION
### (False Claims – Against All Defendants)

142.    Relator incorporates by reference as though fully set forth herein the allegations contained in each and every paragraph of this Complaint.

143.    TSE's application to the Treasury Department for $275 million in cash grants under the American Recovery and Reinvestment Act constitutes a claim as defined by 31 U.S.C. § 3729.

144.    The Project would be eligible for a 1603 Cash Grant only if it was placed in service before January 1, 2017. To be placed in service, TSE must have placed the Project in a condition or state of readiness and availability for a specifically assigned

139341927.1

SECOND AMENDED COMPLAINT

function. However, the Project was not in a condition or state of readiness and availability for its specifically assigned function prior to January 1, 2017, or at any time thereafter. Defendants thus entered into Amendment No. 3 to satisfy "on paper" requirements to be considered placed in service, without those requirements ever actually being met.

145.   At the time TSE's application for a 1603 Cash Grant was under review and consideration with the Treasury Department, Defendants knew that the Project had not passed critical pre-operation testing as envisioned in the EPC Contract or the PPA, including tests necessary to satisfy Commercial Operations and Provisional Acceptance under the PPA and EPC Contract.

146.   At the time TSE's application for a 1603 Cash Grant was under review and consideration with the Treasury Department, Defendants knew that control over the Project had not passed to TSE, the tax payer, and that the Project could not operate safely, reliably, normally and continuously in accordance with the requirements of the EPC Contract, Applicable Laws and Prudent Industry Practices. However, they negotiated and agreed to Amendment No. 3 to the EPC Contract to satisfy the Treasury Department's inquiry, and not because the prerequisites for Provisional Acceptance and, therefore, transfer of control to TSE had actually occurred.

147.   At the time TSE's application for a 1603 Cash Grant was under review and consideration with the Treasury Department, Defendants knew that the Project was not operable on a daily or even regular basis. As discussed *supra*, the Project consistently failed to generate power even remotely close to the levels called for under the PPA and EPC Contract.

148.   At the time TSE's application for a 1603 Cash Grant was under review and consideration with the Treasury Department, Defendants knew that the Project was, in fact, not in operation due to Hot Salt Tank repairs and other major defects in CTPI's construction work. In fact, Defendants knew that construction was not

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

SECOND AMENDED COMPLAINT

complete and that the Project would not be operable at least for several months after the sham Provisional Acceptance.

149. At the time TSE's application for a 1603 Cash Grant was under review and consideration with the Treasury Department, Defendants knew that the Project's intended purpose was to generate approximately 500 GWh of electricity for sale to NVE, and the payment by NVE of above-market rates under the PPA was central to the Project's economic viability.

150. Relator is informed and believes, and thereon alleges, that at the time TSE's application for a 1603 Cash Grant was under review and consideration with the Treasury Department, Defendants knew that the Hot Salt Tank repairs and repairs to the other major defects that were necessary would prevent the Project from generating electricity in the levels required under the PPA and that NVE would therefore have cause to terminate the PPA.

151. Notwithstanding their knowledge of the critical defects causing the Project to be non-operational and perform substantially below guaranteed output levels, and that CTPI's defective and incomplete work would continue to plague the Project for several months after the sham Provisional Acceptance, Defendants failed to make any corrective disclosures to the Treasury Department regarding the date TSE claimed the Project was placed in service, and, Relator is informed and believes, and thereon alleges, never disclosed to the Treasury Department that they had entered into Amendment No. 3 or the substance of Amendment No. 3.

152. Relator is informed and believes, and thereon alleges, that Defendants misrepresented the circumstances surrounding the Project to the Treasury Department intending to induce the Treasury Department to rely on their representations.

153. Relator is informed and believes, and thereon alleges, that, as a result of Defendants' false statements and certifications, the Treasury Department did, in fact,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

issue cash grants in the approximate amount of $275 million, to the direct benefit of TSE and the Cobra Defendants.

## SECOND CAUSE OF ACTION

### (Conspiracy to Present False Claims – Against All Defendants)

154. Relator incorporates by reference as though fully set forth herein the allegations contained in each and every paragraph of this Complaint.

155. Relator is informed and believes, and thereon alleges, that the Cobra Defendants conspired with TSE to submit false statements to the Treasury Department. The Cobra Defendants knew of the substantial defects caused by CTPI's defective work under the EPC Contract, knew that they faced substantial liability if the Project failed and its failure was caused by CTPI's defective work, attempted to cover up those defects from the Project's creditors through submission of false reports, directed their employees and agents to negotiate and enter into Amendment No. 3 to the EPC Contract in order to create Provisional Acceptance "on paper" knowing that doing so was necessary for the Project to receive a 1603 cash grant, and intended to do so in order to induce the Treasury Department to issue the cash grants.

156. The Cobra Defendants further participated in the preparation and submission of materially false and misleading reports to the Treasury Department in connection with TSE's 1603 Cash Grant Application that were intended to conceal from the Treasury Department the true state of the Project, knowing that if the Treasury Department discovered that the Project was non-operational for such an extensive period of time, TSE would lose entitlement to the 1603 Cash Grant.

157. As a result of Defendants' conspiracy to submit, and the submission of false claims to the Treasury Department, the government has been defrauded of approximately $275 million. Furthermore, TSE was able to prematurely claim depreciation, while obtaining from DoE forgiveness of over $255 million TSE owed under the LGA.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

43

SECOND AMENDED COMPLAINT

## PRAYER FOR RELIEF

Wherefore, as a result of the foregoing allegations, Relator prays for judgment in their favor as follows:

1.    For a judgment against Defendants for their submission of false claims to the government, in an amount to be proved at trial, but estimated to be approximately $275,000,000, and for treble damages as permitted under the False Claims Act;

2.    For a judgment awarding punitive damage against Defendants;

3.    For an order adjudging that Relator is entitled to its costs of suit incurred herein;

4.    For an order adjudging that Relator is entitled to recover its attorneys' fees, as allowed by applicable law;

5.    For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1

44

SECOND AMENDED COMPLAINT

Dated: April 19, 2024                    LEWIS BRISBOIS BISGAARD & SMITH LLP


By      */s/ John S. Poulos*
        JOHN S. POULOS
        Nevada Bar No. 15085
        2020 W. El Camino Ave., Suite 700
        Sacramento, CA 95833
        Tel. 916.564.5400

        6385 South Rainbow Blvd., Suite 600
        Las Vegas, NV 89118
        Tel. 702.893.3383

        Attorneys for Relator CMB EXPORT,
        LLC, a Texas limited liability company

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

139341927.1                              45